# EXHIBIT A

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

IN THE CIRCUIT COURT OF BARRY COUNTY
STATE OF MISSOURI

| | |
|---|---|
| CLIFTON REESE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No.: |
| | ) |
| TYSON FOODS, INC., | ) |
| a corporation, | ) |
| SERVE AT: Registered Agent | ) |
|       CT Corporation System | ) |
|       120 S. Central Avenue | ) |
|       Clayton, MO 63105 | ) |
| | ) |
| Defendant. | ) |

## PETITION FOR INJUNCTIVE AND DECLARATORY RELIEF

### INTRODUCTION

1.    Plaintiff Clifton Reese (hereinafter "Plaintiff"), seeks relief from Defendant Tyson Foods Inc.'s ("Tyson")'s pattern of discrimination against employees who request religious or medical accommodations from Tyson's COVID-19 vaccination mandate policy.

2.    Tyson addresses a very remote risk: the at-employment risk of asymptomatic deadly spread of Covid-19 to fellow employees by a method (vaccination), that actually poses a higher risk of deadly spread of Covid-19 than asymptomatic spread, when self-quarantining the symptomatic and testing more easily suffices.

3.    Missouri law and the Missouri Human Rights Commission Act, compels Tyson to accommodate employees rather than discriminate against them when those employees seek medical or religious reasons for not taking a compelled medical treatment. Instead, Tyson treats them as disabled employees who must be

terminated. Rather than complying with the Missouri law, Tyson responded to their employees seeking medical or religious exemptions, by informing those employees that they would be effectively terminated on November 1, 2021 and placed on a one-year unpaid leave of absence with no assurance that they would be allowed to return to the workplace in one year.

4. Tyson's unlawful actions leave Plaintiff with the impossible choice of suffering a physical assault and uninvited invasion of his body by receiving the experimental COVID-19 vaccine, at the expense of his religious beliefs, bodily autonomy, medical privacy, and at risk to his health, or losing his livelihood and being unable to provide food, housing, and support for himself and his family.

5. The Faustian bargain is no bargain at all and is precisely what is forbidden by the Missouri law. The relief sought herein is precisely what both those laws expressly approve: equitable relief.

6. Tyson's actions violate Missouri law by failing to provide reasonable accommodations, as well as by retaliating against employees who engaged in protected activity. The plaintiff only seeks this court to order that Tyson comply with the laws protecting the rights of Missouri against precisely such catch-22 "choices".

**PARTIES**

7. Plaintiff Clifton Reese is a manager at Tyson's complex in Monett, Missouri ("Monett complex") who has requested an exemption from the mandatory vaccination on religious grounds. He is a citizen of Missouri and a resident of Barry County, Missouri.

8.   Plaintiff has been employed with Tyson since September 3, 2013, with advancement in his employment. He has received advancement with Defendant, pay increases, and bonuses.

9.   Plaintiff has declined to receive the mandatory vaccination for religious reasons. His religious exemption was granted by Defendant.

10.  Defendant Tyson Foods, Inc. ("Tyson") together with its subsidiaries, is a corporation that operates as a worldwide food processing and marketing company. Defendant has a plant in Barry County, Missouri. All actions described herein of Defendant's employees were with the scope of their employment with Defendant. Defendant is liable for its employees actions.

11.  Tyson is the world's second largest processor and marketer of chicken, beef, and pork.   Tyson employs approximately 139,000 people in the United States and operates six facilities in the state of Missouri.   Tyson's facilities throughout Missouri employ thousands of people.   A key complex at issue in this case is Tyson's complex at Monett, located in Barry County, Missouri.

12.  At all relevant times, Tyson knew or should have known of the laws, policies, practices, and conditions alleged herein.

13.  Defendant has threatened to force leave without pay and loss of employment unless immediate relief is granted. Plaintiff's damage exceeds $25,000.00. Plaintiff seeks a temporary restraining order and permanent injunction against Defendant.

14.  In September, 2021, Tyson requests Plaintiff to take the COVID-19 vaccination. When Plaintiff did not agree, Tyson stated that Plaintiff's position would be posted. "Posted" means his job is open for others in the company. When filled with another,

3

Plaintiff would lose his position. As of October 23, 2021, Plaintiff has been informed his position will be filled by another on November 1, 2021.

## JURISDICTION AND VENUE

15.     This Court has personal and subject matter jurisdiction over this action.

16.     This Court has personal jurisdiction over Defendant Tyson because Tyson transacts its business in Missouri, and the wrongful conduct and resulting injuries alleged herein substantially occurred in this state. Defendant's Registered Agent is C T Corporation System and can be served at 120 S. Central Ave., Clayton, MO 63105.

17.     Venue is proper in this judicial district because the cause of action arises primarily from Tyson's Monett complex situated in Barry County, Missouri.

## FACTS

A.     <u>**Plaintiff's Employment with Defendant**</u>

18.     Plaintiff began his employment with Defendant on September 3, 2013.

19.     Plaintiff received advancement and salary increases. His current title is Senior Live Production Manager. His base salary is $113,907.75 per year with stock matching, health insurance coverage for himself and his family, comp time, vacation time, and other benefits.

20.     Plaintiff has had no negative employment issues with Defendant.

21.     Plaintiff has complied with Defendant's COVID requirements of wearing a face mask, social distancing, temperature checks, and when requested, taking a COVID test.

22.     There have been no COVID issues in Plaintiff's employment with the Defendant.

4

23. On or about August 2, 2021, the Defendant's CEO and management mandated COVID vaccinations for all of Defendant's employees.

24. In response, Monett complex Human Resources Manager, April Fritz, started making medical private confidential health inquiries to the employees at the Monett complex for Defendant.

25. In Ms. Fritz's communications, she would request to other private confidential medial information including information of the Plaintiff's confidential medical health.

26. These reports also were circulation to unauthorized third parties by Ms. Fritz on who was not vaccinated at the Monett complex.

27. Ms. Fritz at all times as well as all other named employees of Defendant were acting within the scope of their employment following Defendant's publicized procedures.

28. Defendant is liable for its employees' acknowledging vaccination before November 1, 2021.

29. Since and during these conversations, Defendant employees declared that if Plaintiff made a religious or medical exemption to the COVID vaccination his job would be immediately posted for another.

30. Plaintiff in his response to Defendant employees stated he had several religious concerns about the Covid vaccination. He argued to file for religious exemption.

31. Defendant employee discouraged Plaintiff from declaring a religious exemption and encouraged him to be vaccinated.

32. Defendant posted Plaintiff's position for hiring or about September 7, 2021.

5

33. Defendant employee immediately informed Plaintiff he would be on a forced leave of absence without pay beginning November 1, 2021.

34. Plaintiff is scheduled to have performance bonus. Defendant employee reported he cannot receive his performance bonus.

35. Plaintiff also has unused comp time with Defendant has reported he would also lose.

36. On or about September 26, 2021, Plaintiff filed a complaint with the Missouri Commission of Human Rights.

37. Upon Defendant's notice of this complain by the Missouri Human Rights Commission, Plaintiff was questioned by Ms. Fritz and interrogated as to why he filed the complaint.

38. Prior to the filing, Plaintiff was being treated unfriendly. After filing, he was treated harshly. His supervisor failed to respect Plaintiff's performance of his job duties and notice of emergencies.

39. That on or about September 7, 2021, Ms. Fritz listed publicly Plaintiff and other employees who had not been COVID vaccinated.

40. There was sent in general circulation with others receiving Plaintiff's private confidential medical information.

41. Because Plaintiff did not provide proof of card vaccination nor had he not yet made his personal medical health decision, Defendant's employees had continued contact, communication, and harassment of the Plaintiff to compel him to take the COVID vaccination.

42. Plaintiff has been a model Christian employee for the Defendant.

6

43.     Plaintiff has performed beyond normal duties with the Defendant resulting in advancement.

44.     Plaintiff has performed his employment control duties except for the COVID vaccine, which he declared to religious belief and filing valid legal religious exemption.

**B.     Coronavirus and Tyson's Response**

45.     The novel coronavirus SARS-CoV-2, which causes the disease COVID-19, is a contagious virus which spreads person-to-person, including through the air.

46.     Nearly two years ago, on January 15, 2020, a Washington state resident became the first person in the United States with a confirmed case of SARS-CoV-2.

47.     In the spring of 2020, Tyson began implementing mitigation procedures for its workforce, including several of the following requirements for its employees like masks, face shields, social distancing, temperature checks, COVID-19 testing,[1] and self-quarantines.[2] Tyson initially made several accommodations for hourly employees.[3] For example, in March of 2020, the company relaxed attendance policies in its plants by "[] eliminating any punitive effect for missing work due to illness."[4]

---

[1] Tyson Foods, *Tyson Foods CEO Provides Update on Efforts to Address COVID-19* (April 6, 2021) available at https://www.tysonfoods.com/news/news-releases/2020/4/tyson-foods-ceo-provides-update-efforts-address-covid-19 (last visited Sept. 27, 2021); Tyson Foods; *Why Tyson Has Taken a Leading Position on COVID-19 Testing* (July 1, 2021) available at https://thefeed.blog/2020/07/01/covid-19-testing-at-tyson-foods/ (last visited Sept. 27, 2021).
[2] Tyson Foods, *Protecting Team Members and Our Company; Ensuring Business Continuity* (March 17, 2020) available at https://www.tysonfoods.com/news/news-releases/2020/3/protecting-team-members-and-our-company-ensuring-business-continuity (last visited Sept. 27, 2021); Chattin Cato, *Tyson Team Innovates to Make Face Shields for Frontline Workers* (July 6, 2021) available at https://thefeed.blog/2020/07/06/tyson-innovates-to-make-face-shields-for-frontline-workers/ (last visited Sept. 27, 2021).
[3] *Id.*
[4] *Id.*

7

48. Tyson experienced substantial success reducing the risk of COVID-19 spread through self-quarantining for the symptomatic and testing for the asymptomatic persons. As even Anthony Fauci admits, the risk of asymptomatic spread is very rare and very low, with experts estimating it is largely a non-existent risk. At worst, asymptomatic risk of employees spreading lethal COVID-19 is less than one-in-a-million. Even in that one-in-a-million risk, testing easily addresses asymptomatic risk without requiring bodily invasion against a person's will of an experimental drug with unknown long term side effects due to its novel mRNA methodology, with the worst short-term adverse events reported in the government's VAERS database in American history, and whose administration offends the conscience of millions of Americans' deeply held spiritual beliefs and religious faith due to the use of aborted fetal cells in its testing, development and production of each of these experimental vaccines.

## C. Tyson's Unlawful Vaccine Mandate

49. The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech vaccine on December 1, 2020. One week later a second EUA for the Moderna COVID-19 vaccine. Finally, the FDA issued a EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021.

50. Though the FDA has approved the use of a currently unavailable vaccine for future use, the only vaccines widely available for use in the United States are these three experimental, investigative and unlicensed drugs, all of which were either developed, tested, or produced with the use of fetal cells from aborted fetuses.

8

51.     Since the rollout of the vaccines, data increasingly show the vaccines do not prevent infection, do not prevent transmission, and do prevent illness. Indeed, countries with the most aggressive, expansive use of the vaccines see record-setting infection rates and continuing high illness rates. Governmental authorities revised their definition of the word "vaccine" itself in order to continue to label these experimental drugs with novel ingredients, "vaccines" because they fail to meet the test of traditionally defined vaccines which actually inoculated against infection and prevented transmission, neither of which this drug can any longer claim credit for. This reflects the fact there has never been a successful coronavirus vaccine in history due to the viral evolution each virus mutates into.

52.     On approximately August 3, 2021, Tyson publicly announced it would require all "[]team members at U.S. office locations to be fully vaccinated by October 1, 2021."[5] (A true and correct copy of Tyson's August 3, 2021 COVID-19 vaccine mandate, is attached as *Exhibit A*, and incorporated herein by reference). Tyson also announced that all other team members, thus including plant team members, would be required to be vaccinated by November 1, 2021.[6]

53.     Tyson publicly stated that "Exceptions to the vaccination mandate will involve workers who seek medical or religious accommodation."[7]

54.     In announcing the mandate, Tyson CEO Donnie King justified the decision by claiming, "[]the U.S. Centers for Disease Control and Prevention is reporting *nearly*

---

[5] Tyson Foods, *Tyson Foods to Require COVID-19 Vaccination for its U.S. Workforce* (Aug. 3, 2021) available at https://www.tysonfoods.com/news/news-releases/2021/8/tyson-foods-require-covid-19-vaccinations-its-us-workforce (last visited Sept. 27, 2021).
[6] *Exhibit A.*
[7] *Id.*

*all hospitalizations and deaths* in the U.S. are among those who are unvaccinated"

(emphasis added).[8] As set forth herein below, Mr. King's statement was false.

**D.    The Risks Associated with Coronavirus**

55.    Coronavirus presents a risk primarily to individuals aged 85[9] or older and those

with comorbidities such hypertension and diabetes.[10]

56.    The vast number of deaths associated with COVID-19 occur in those over the age

of 55.[11] Within the most heavily impacted age group (age 85 and up), only 13.3%

of deaths from February 2020 to February 2021 were attributed to COVID-19.[12]

57.    One of the most useful measures for calculating the risk of dying from a virus is the

infection-fatality rate ("IFR"). The IFR is calculated by dividing the number of

COVID deaths by the number of COVID infections. It attempts to answer the

critical question: If I get sick, what is the chance that I will die?" The Center for

Disease Control and Prevention estimates the IFR for the bulk of most working-age

adults is exceedingly low.[13] For adults under age 50, the CDC's "current-best

estimate" is that 500 people will die per 1,000,000 infections nationwide.[14] In other

---

[8]  Donnie King, *Our Next Step in the Fight Against the Pandemic* (Aug. 3, 2021) available at https://web.archive.org/web/20210803143911/https://thefeed.blog/2021/08/03/our-next-step-in-the-fight-against-the-pandemic/ (last visited Sept. 27, 2021).

[9]  Mayo Clinic, *COVID-19: Who's at higher risk of serious symptoms* (Aug. 24, 2021) available at https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-who-is-at-risk/art-20483301?p=1 (last visited on Aug. 28, 2021).

[10]  Wern Hann, et. al., *Comorbidities in SARS-CoV-2 Patients: a Systematic Review and Meta-Analysis,* (February 2021) available at https://journals.asm.org/doi/10.1128/mbio.03647-20?permanently=true& (last visited on Aug. 28, 2021).

[11]  Heritage Foundation, *COVID-19 Deaths by Age,* Heritage Foundation (Feb. 17, 2021) available at https://datavisualizations.heritage.org/public-health/covid-19-deaths-by-age/ last visited (Sept. 1, 2021); *See also, See, COVID-19: Who's at higher risk of serious symptons.*

[12]  *Id.*

[13]  CDC, *COVID-19 Pandemic Panning Scenarios*, Centers for Disease Control and Prevention (March 19, 2021) available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html last visited (Sept. 1, 2021).

[14]  *Id.*

10

words, for every one million adults infected age 50 or younger, 999,500 of them will survive COVID-19.[15]

58.     Assuming the data regarding COVID-19 infections is accurate, the CDC's numbers show Americans across the board are far more likely to die of something other than COVID-19.[16]

**E.      Asymptomatic People Pose Little Risk of Transmitting the Virus**

59.     Tyson already employs a very successful method of preventing COVID-19 spread from the symptomatic – self-quarantine. Tyson's vaccination mandate only addresses one risk: asymptomatic lethal spread. The problem with Tyson's approach is two-fold: first, asymptomatic lethal spread is less than a one-in-a-million risk at worst; and testing more effectively, and easily, suffices rather than forced injections of unwanted experimental, potentially life-altering drugs developed in ways that offend many Missourians' religious beliefs.

60.     Tyson uses the specter of "asymptomatic spread" – the notion that fundamentally healthy people could transmit COVID-19 to others without having any symptoms of COVID-19 – to justify its vaccine mandate. But there is little credible scientific evidence that demonstrates the phenomenon of "asymptomatic spread" poses any meaningful danger to Tyson employees or anyone else, for that matter. Indeed, it is "very rare" even according to Anthony Fauci, and, at worst, poses a one-in-a-million risk of lethal spread. Tyson's response to COVID-19 is predicated in part

---

[15] *Id.*
[16] *See,* Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male, NATURE* (Aug. 28, 2020) [individuals under 50 face a negligible threat of a severe medical outcome from a coronavirus infection, akin to the types of risk that most people take in everyday life, such as driving a car].

11

on the flawed assumption that asymptomatic individuals pose a meaningful risk of spreading the disease.

61. Evidence of transmission requires that an individual can be shown to be the source of infection for another person who then developed symptoms of a disease/illness.

62. Basic microbiology shows that infectiousness or transmission of viruses such as COVID-19 require an active infection resulting in elevated levels of viral replication in the host and shedding of the virus.[17]

63. Decades of research demonstrates that symptomatic people, such as those coughing, sneezing, and wheezing, are the read drivers of viral spread, a fact Dr. Anthony Fauci initially acknowledged during the early days of the pandemic when he told the press, "[E]ven if there is some asymptomatic transmission, in all the history of respiratory-borne viruses of any type, asymptomatic transmission has never been the driver of outbreaks. *The driver is always a symptomatic person*"[18] (emphasis added).

64. When the viral replication process is blocked by a healthy immune system, the virus is neutralized, preventing significant viral replication and shedding. This occurs in approximately half the people exposed to the virus. Their immune system's defense effectively wards off COVID-19 before it can take hold and cause asymptomatic

---

[17] *See generally*, Samuel Baron, et. al., *Medical Microbiology* (4th ed. 1996) available at https://www.ncbi.nlm.nih.gov/books/NBK8149/ (last visited Sept. 27, 2021); *See also*, Hitoshi Kawasuji, et. al, *Transmissibility of COVID-19 depends on the viral load around onset in adult and symptomatic patients*, PLOS ONE (Dec. 9, 2020) available at https://journals.plos.org/plosons/article?id=10.1371/journal.pone.0243597 (last visited Sept. 27, 2021).

[18] U.S. Department of Health and Human Services, *Update on the New Coronavirus Outbreak First Identified in Wuhan*, China, YouTube (Jan. 28, 2020) available at https://www.youtube.com/watch?v=w6koHkBCoNQ&t=2638s (last visited Sept. 27, 2021).

12

disease. Research demonstrates that asymptomatic people are not the driver of COVID-19 transmission as demonstrated in the following points.

65. Researchers studying real-world laboratory samples of more than a quarter-million people found that even with a positive RT-PCR test, asymptomatic people have a much lower probability of being infectious.[19] According to a meta-analysis of contact tracing studies published in the *Journal of the American Medical Association,* at most, asymptomatic COVID-19 spread was only about 0.7%.

66. A research article published in the CDC's *Emerging Infectious Diseases* journal notes that little to no transmission of COVID-19 occurred from asymptomatic people studied by researchers in Germany.[20] The researchers note, "The fact that *we did not detect any* laboratory-confirmed SARS-CoV-2 transmission from asymptomatic case-patients is in line with multiple studies…"[21] (emphasis added). The lack of scientific and medical evidence surrounding the asymptomatic spread led the researchers to conclude that asymptomatic spread is "unlikely to substantially spread COVID-19."[22]

67. A review in March 2021 of all the published meta-analyses on asymptomatic transmission from Dr. John Lee, a retired British Professor of Pathology, reveals that in many cases, the same few studies have been recycled repeatedly to support the flawed proposition that those who are asymptomatic pose a real danger.[23] In the

---

[19] *The performance of SARS-CoV-2 RT-PCR test as a tool for detecting SARS-CoV-2 infection in the population*
[20] Jennifer K. Bender, *Analysis of Asymptomatic and Presymptomatic Transmission in SARS-CoV-2 Outbreak, Germany, 2020*, 27 Emerging Infectious Diseases 4 (April 2021) available at https://wwwnc.cdc.gov/eid/article/27/4/20-4576_article (last visited Sept. 27, 2021).
[21] *Id.*
[22] *Id.*
[23] See, John Lee, *Asymptomatic spread: who can really spread COVID-19,* Health Advisory & Recovery Team (March 2021) available at https://www.hartgroup.org/wp-content/uploads/2021/03/ASYMPTOMATIC-SPREAD.pdf, (last visited Aug. 28, 2021).

words of Allyson M. Pollock, a professor of public health at Newcastle University in the United Kingdom, "Searching for people who are asymptomatic yet infectious is like searching for needles that appear and reappear transiently in haystacks, particularly when rates are falling."[24]

68. Moreover, according to the FDA, there is insufficient data to determine the vaccines authorized for emergency-use[25], actually prevent asymptomatic infection or the transmission of SARS-CoV-2, the virus that causes COVID-19.

69. Recently, the CDC reported that "new scientific data" demonstrated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[26]

70. Tyson's vaccine mandate "accommodation" – limiting asymptomatic unvaccinated employees from its workplace by effectively terminating them – flies in the face of the current scientific literature, which shows asymptomatic spread of COVID-19 is virtually non-existent.

71. In sum, there is little objective evidence to support a finding that asymptomatic spread is a driver of COVID-19 and therefore, poses a danger to Tyson's workplaces. Rather, the epidemic spread of COVID-19 is propelled almost

---

[24] Allyson M. Pollock, *Asymptomatic transmission of covid-19, theBMJ* (Dec. 21, 2020) available at https://www.bmj.com/content/371/bmj.m4581 (last visited Sept. 27, 2021).

[25] The Pfizer and BioNTech BNT162b2 COVID-19 vaccine (hereafter, "the Pfizer vaccine"); the ModernaTX mRNA-1273 COVID-19 vaccine (hereafter, "the Moderna vaccine"); the Janssen Biotech, Inc. (Johnson & Johnson) Ad26.COV2.S COVID-19 vaccine (hereafter, "the Johnson & Johnson vaccine") (collectively, "COVID-19 vaccines").

[26] *See CDC reversal on indoor masking prompts experts to ask, "Where's the data?", WASHINGTON POST (July 28, 2021), available at wapo.st/2THpmIQ* (last visited Oct. 2, 2021).

14

exclusively by *symptomatic persons* (some of whom are fully vaccinated) who can easily self-isolate or quarantine from their co-workers.

72.     A reasonable accommodation to vaccination is not to place perfectly healthy workers on unpaid status, and further to ban them from the workplace for up to a year, as Tyson now says it will do. Tyson's COVID-19 vaccination mandate is nonsensical, unjust, and a violation of Missouri law. A far more sensible policy is to require those experiencing symptoms consistent with COVID-19 to self-isolate or quarantine from the workplace.

**F.      Tyson's Vaccine Mandate Will Not Stop the Spread of COVID-19**

73.     Recent Israeli data found that those who had received the BioNTech vaccine were 6.72 times more likely to suffer a subsequent infection than those with natural immunity.[27] Israeli data also indicates the protection BioNTech grants against infection is short-lived compared to natural immunity and degrades significantly faster. In fact, as of July 2021, vaccine recipients from January 2021 exhibited only 16% effectiveness against infection and 16% protection against symptomatic infection, increasing linearly until reaching a level of 75% for those vaccinated in April.[28]

74.     Similarly, scientists studying over 4,000 frontline workers found that between December 2020 until April 2021, the effectiveness of the vaccines cratered from 91

---

[27] David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection?* Israel National News, (Jul. 13, 2021), available at https://www.israelnationalnews.com/News/News.aspx/309762 (last visited Aug. 26, 2021).
[28] Nathan Jeffay Israeli, *UK Data Offer Mixed Signals on Vaccine's Potency Against Delta Strain,* THE TIMES OF ISRAEL (July 22, 2021), available at bit.ly/3xg3uCg (last visited Aug. 26, 2021).

percent to 66 percent. This drastic decline occurred *before* the SARS-CoV-2 Delta variant became the predominant variant.[29]

75.    Even more alarming, research focusing on the Pfizer vaccine's effectiveness in America shows that from December 14, 2020 until August 8, 2021, the vaccine plummeted in effectiveness, collapsing from 88 percent to 47 percent.[30]

76.    Israel, the most aggressively vaccinated nation in the world, saw its COVID-19 cases dramatically rise to unprecedented levels while its neighbors saw no such increase, even as the country became more and more vaccinated.

77.    A paper published in *Euro Surveillance*, a journal published by the European Centers for Disease Control, documents a significant outbreak of COVID-19 among fully vaccinated patients and staff at a hospital in Tel Aviv.[31] At the time of the outbreak, investigators determined 238 out of 248 of exposed patients and staff had been fully vaccinated with Pfizer's mRNA vaccine.[32] Ultimately, 39 out of the 238 exposed vaccinated people (16 percent) were infected, along with 3 out of 10 unvaccinated people – a difference that doesn't reach statistical significance because the unvaccinated group is too small.[33] Of the infected, 23 were patients and 19 staff.[34] The staff all recovered quickly, but five patients died and another nine

---

[29] Ashley Fowlkes, et. al., *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance – Eight U.S. Locations, December 2020 – August 2021*, 70 Morbidity and Morality Weekly Report, (Aug. 27, 2021) available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.htm (last visited Sept. 27, 2021).

[30] Sara Y. Tartof, et. al., *Six-month effectiveness of BNT162b2 mRNA COVID-19 vaccine in a large US integrated health system: a retrospective cohort study*, MedRxiv (July 28, 2021) available at https://www.medrxiv.org/content/10.1101/2021.07.28.21261159v1 (last visited Aug. 26, 2021).

[31] Pinina Shitrit, et. al., *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021*, (July 2021) available at https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2021.26.39.2100822#html_fulltext (last visited on Oct. 3, 2021).

[32] *Id.*

[33] *Id.*

[34] *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021.*

had severe or critical cases.[35] *All were vaccinated.*[36] On the other hand, the two unvaccinated infected patients both had only *mild* cases of COVID-19.[37]

78. The fact that 96 percent of the people in the Tel Aviv hospital population had been vaccinated – a level far above early estimates of the percentages required for herd immunity – apparently made no difference in stopping the spread of COVID-19.[38] As the authors explained: "This communication…challenges the assumption that high universal vaccination rates will lead to herd immunity and prevent COVID-19 outbreaks…"[39]

79. The crumbling effectiveness of the vaccines should come as little surprise as currently all available COVID-19 "vaccines" do not function the way vaccines are expected to work by the public. As currently understood, the main benefit the available vaccines may confer is a reduction of serious clinical disease, thus, lessening a person's symptoms from COVID-19, but not stopping infection or preventing vaccinated persons from spreading the virus.

**G.** **Natural Immunity is Durable, Lasting, and Superior to Vaccination**

80. There is strong evidence that persons who have been infected with SARS-CoV-2 and recovered are protected from future reinfection for over a year, and potentially have lifelong immunity – unlike vaccinated persons for whom boosters are already being recommended and administered.[40] It is therefore a true medical mystery why Tyson wholesale disregard the relevance of natural immunity entirely.

---

[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021.*
[39] *Id.*
[40] *See,* Yair Goldberg; Micha Mandel, et. al., *Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2 vaccine protection: A three month nationwide experience from Israel,* medRxiv (April 20, 2021) available

17

81.     Natural immunity includes antibodies, B-cells, plasma cells, T-helper cells, T-presenting cells, natural killer cells, and a host of innate defenses against the virus. Natural immunity is robust, durable, and complete against all variations of SARS-CoV-2.

82.     A bevy of epidemiological studies demonstrate to a reasonable degree of medical certainty that natural immunity following infection and recovery from the SARS-CoV-2 virus provides robust and durable protection against reinfection, at levels equal to or better than the most effective vaccines currently available.[41]

83.     For example, a recent analysis of an outbreak among a small group of mine workers in French Guinea found that 60 percent of fully vaccinated miners suffered breakthrough infections compared to zero among those with natural immunity.[42]

84.     Likewise, Scientists from the University of California, San Diego who assessed multiple mechanisms of adaptive immunity (e.g. CD4+ T cell, CD8+ T cell, and humoral immunity) demonstrated that immunity for COVID-19 following infection is likely durable.[43]

85.     What is more, Israeli researchers conducting a massive group study found exceedingly low reinfection rates for people previously infected with COVID-19,

---

at https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1 (last visited on Aug. 26, 2021); *See, also* Jackson S. Turner, Wooseob Kim, et. al., *SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans*, Nature 595 (pp. 421-425) (May 24, 2021).

[41] *See, e.g.* N. Kojima; A. Roshani, et. al., *Incidents of Severe Acute Respiratory Syndrome Coronavirus-2 Infection among previously infected or vaccinated employees,* medRxiv (July 3, 2021) available at https://www.medrxiv.org/content/10.1101/2021.07.03.21259976v2 (last visited on Aug. 26, 2021).

[42] Nicholas Vignier, et. al., *Breakthrough Infections of SARS-Co V-2 Gamma Variant in Fully Vaccinated Gold Miners, French Guinea, 2021,* 27(10) EMERG. INFECT. DIS. (Oct. 2021), *available at* bit.ly/2Vmjx43 (last visited on Oct. 2, 2021).

[43] Jennifer M. Dan, et. at., *Immunological memory to SARS-CoV-2 assessed for up to 8 months after infection,* National Center for Biotechnology Information (Jan. 6, 2021) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7919858/ (last visited Oct. 3, 2021).

18

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

too.[44] More interestingly, the Israeli scientists found people who receive both doses of the EUA-approved Pfizer shot were up to *13 times more likely to contract the virus than those who were previously infected with the virus.*[45]

86. Studying more than 800,000 people split into three groups, the Israel team concluded:[46]

> "This study demonstrated that *natural immunity confers longer lasting and stronger protection against infection,* symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2, compared to the BNT162b2 two-dose vaccine-induced immunity." (emphasis added).

87. The above findings are particularly important because the Delta variant accounted for nearly all coronavirus infections in Israel by the summer of 2021 thus, conclusive evidence that natural immunity *remained protective against Delta.*

88. Consistent with the Israeli research team's findings, the Cleveland Clinic found similar data supporting the strong durability of natural immunity. In June of 2021, the Cleveland Clinic released a study of 1,359 previously infected health care workers. Researchers found a reinfection rate of *zero*, despite some of the studied individuals having been around COVID-positive patients more than the regular population.[47] Not one of the 1,359 previously infected subjects who remained unvaccinated, had a SARS-CoV-2 infection over the duration of the Cleveland Clinic study.[48]

---

[44] *See,* Svian Gazit, et. al., *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfection versus breakthrough infections,* medRxiv, https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf (last visited on Aug. 26, 2021).
[45] *Id.*
[46] *Id.*
[47] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals,* medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).
[48] *Id.*

19

89. The Cleveland Clinic researchers concluded: "*Individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination*, and vaccines can be safely prioritized to those who have not been infected before." (emphasis added).[49]

90. Similarly, researchers studying patients in Seattle and Atlanta found that most recovered COVID-19 patients produced durable antibodies, memory B cells, and durable polyfunctional CD4 and CD8 T cells, which target multiple parts of the virus.[50] "Taken together, these results suggest that broad and effective immunity may persist long-term in recovered COVID-19 patients," concluded the authors. Thus, unlike with the vaccines, no boosters are required to assist natural immunity.

91. Moreover, Researchers in California conclude: "Natural infection induced expansion of larger CD8 T cell clones occupied distinct clusters, likely due to the *recognition of a broader set of viral epitopes* presented by the virus *not seen in the mRNA vaccine*" (emphasis added).[51]

92. Further, in June of 2021, Rockefeller University researchers published a paper in *Nature* examining how antibodies changed up to a year after coronavirus infection and recovery.[52] The authors report: "B cell clones expressing broad and potent antibodies are selectively retained in the repertoire over time and expand markedly

---

[49] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).

[50] Kristen W. Cohen, et. al., *Longitudinal analysis shows durable and broad immune memory after SARS-CoV-2 infection with persisting antibody responses and memory B and T cells,* Cell Reports Medicine (July 20, 2021).

[51] Suhas Sureschandra, et. al., *Single cell profiling of T and B cell repertories following SARS-CoV-2 mRNA vaccine,* bioRxvi, (July 15, 2021).

[52] Zijun Wang, et. al., *Naturally enhancing neutralizing breath against SARS-CoV-2 one year after infection,* Nature, (June 14, 2021) available at https://www.nature.com/articles/s41586-021-03696-9, (last visited August 26, 2021).

20

after vaccination. The data suggest that immunity in convalescent individuals will be very long lasting."[53]

93.     Aside from more robust T cell and memory B cell immunity, which is likely more important than antibody levels, another team of Israeli researchers found that antibodies wane slower among those with prior infection. In vaccinated subjects, antibody titers decreased by up to 40% each subsequent month while in convalescents they decreased by less than 5% per month.[54]

94.     Given the mounting body of compelling research, it is medically unnecessary for persons who have recovered from COVID-19 and present evidence of natural immunity, to undergo vaccination for SARS-CoV-2.

95.     Therefore, forcing immune Plaintiff to receive the COVID-19 vaccine would not only offer him or those around him little benefit, but it would also subject him to an elevated risk of adverse side effects, including death, as demonstrated below.

**H.     Defendant Failed to Properly Consider the Known and Potential Risks of the Vaccine**

96.     The government operated VAERS database is intended to function as an "early warning" system for potential health risks caused by vaccines. Presently, VAERS is broadcasting a red alert, but Tyson refuses to heed the warning and instead is barreling down the tracks of forced vaccination at full steam.

---

[53] *Id.*
[54] Ariel Israel, et. al., *Large-scale study of antibody titer decay following BNT162b2 mRNA vaccine or SARS-CoV-2 infection*, medRxiv, (August 22, 2021).

21

97.     Recent data presents an alarming picture: As of early September, there have been 14,506 deaths reported to VAERS from COVID-19 vaccines[55], compared to just 8,673 for the preceding 30 years for all other vaccines.[56]

98.     According to Josh Guetzhow, Ph.D, there are *91 times* the number of deaths and *276 times* the number of coagulopathy events reported after COVID-19 vaccination than after flu vaccination.[57]

## Number of Deaths Reported to VAERS Since 1990



99.     Moreover, new research suggests the heightened risk of adverse effects results from "preexisting immunity to SARSCov-2 [that] may trigger unexpectedly intense, albeit relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals."[58]

---

[55] Josh Guetzhow, Safety Signals for COVID Vaccines Are Loud and Clear. Why Is Nobody Listening?, THE DEFENDER, (Sept. 29, 2021) available at https://childrenshealthdefense.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/ (last visited Oct. 2, 2021).
[56] *Id.*
[57] *Id.*
[58] Angeli et. al., *SARS-CoV-2 Vaccines: Light and Shadows*, 88 EUR. J. INTERNAL MED. 1, 8 (2021).

22

100.    Although the number of VAERS reports is alarming in its own right, it is likely the true number of adverse effects associated with the COVID-19 vaccines far exceeds cases reported to VAERS.

101.    In 2010, a federal study commissioned by the U.S. Health and Human Services and performed by Harvard consultants on behalf of the Agency for Healthcare Research and Quality (AHRQ) found that "fewer than 1% of vaccine adverse events" are ever reported to VAERS.[59] Thus, it is likely scores of adverse events associated with the COVID-19 vaccines, including deaths, are going unreported.

102.    But it is just not VAERS that is broadcasting a red alert. On October 1, 2021, the European Union's drug regulator, The European Medicines Agency ("EMA"), identified a new possible link between rare cases of blood clotting in deep veins with Johnson & Johnson's COVID-19 vaccine.[60] The EMA said the new, possibly life-threatening clotting condition known as venous thromboembolism (VTE) should be included on the Johnson & Johnson product label as a possible side-effect of the shot.[61]

103.    What is more, the Moderna and Pfizer Vaccines are made with polyethylene glycol ("PEG"). PEG has been linked to anaphylaxis in numerous recipients of the vaccine. PEG is the delivery mechanism to the cells which keeps the MRNA from dispersing and not reaching its intended target. PEG performs its intended use.

---

[59] Lazarus, Ross, MMBS, et. al., *Electronic Support for Public Health-Vaccine Adverse Event Reporting System (ESP:VAERS)*, Agency for Healthcare Research and Quality (Sept. 30, 2010) available at https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf (last visited Oct. 2, 2021).

[60] Reuters, EU finds J&J COVID shot possibly linked to another rare clotting condition, REUTERS (Oct. 1, 2021) available at https://www.reuters.com/business/healthcare-pharaceuticals/eu-finds-jj-covid-shot-possibly-linked-another-rare-clotting-condition-2021-10-01/ (last visited Oct 2, 2021).

[61] *Id.*

23

Unfortunately, about 70% of the U.S. Population is slightly to somewhat allergic to PEG. Despite that most of the United States is only mildly allergic to PEG, approximately 7% of the U.S. Population is highly allergic to PEG.

104. The National Institute of Health ("NIH") recently began a clinical trial of "systemic allergic reaction to the Moderna or Pfizer-BioNTech COVID-19 vaccines" due to recipients of those vaccines experiencing anaphylaxis."[62]

105. It has also been reported that "The Pfizer/BioNTech COVID-19 vaccines can cause severe anaphylaxis" tied to the PEG used.[63]

106. Despite the very well-known anaphylaxis risks associated with the COVID-19 vaccines, Tyson is not offering PEG allergy testing as part of its vaccine mandate.

107. Moreover, Tyson is not offering any indemnity or disability coverage from any of the known and potential adverse effects of the COVID-19 vaccines.

108. To summarize, the potential adverse effects Plaintiff faces in being coerced to receive the COVID-19 vaccines pursuant to Tyson's mandate are not theoretical, hypothetical, or academic – they are very real and have real victims. Given the alarming reports of adverse side-effects associated with the COVID-19 vaccines, subjecting Plaintiff to vaccination exposes him to a variety of health risks ranging from headaches to blood clots to death.

I. **Tyson Exaggerates the Specter of the Virus to Justify the Vaccine Mandate**

109. Tyson maintains several facilities across Missouri, including sites in Barry County.

---

[62] *See* https://www.nih.gov/news-events/news-releases/nih-begins-study-allergic-reactions-moderna-pfizer-biontech-covid-19-vaccines
[63] *See* https://onlinelibrary.wiley.com/doi/10.1111/cea.13874.

24

110.  Tyson's Chief Medical Officer, Dr. Claudia Coplein, appealed to fear, not science, when she publicly opined that forced vaccination was the "single most effective" thing Tyson could do because unvaccinated people were causing rising case counts.[64]

111.  But data from Missouri Department of Health ("MDH") does not support Dr. Coplein's hyperbolic remarks. MDH reports 3,070 cases of COVID-19 in Barry County since March of 2020.[65] As of October 17, 2021, MDH reports 2,983 of the 3,070 cases of COVID-19 are considered either "inactive" or "recovered."[66] This is true even though only 45.4% of the county is fully vaccinated.[67] Thus far, only 60 deaths caused or associated with COVID-19 have been reported in Barry County since the advent of the virus nearly two years ago.[68]

112.  Similarly, in Lawrence County, MHD's COVID Dashboard shows 4,016 cases of COVID-19 have been reported since March of 2020.[69] Like in Barry County, the vast majority of the reported cases in Lawrence County show either "inactive" or "recovered." This is despite the fact that only 36.75% of the county is fully vaccinated.[70] Data for Lawrence County shows only 104 deaths as a result of COVID-19 since March of 2020.

---

[64] Tyson Foods, *Tyson Foods to Require COVID-19 Vaccinations for its U.S. Workforce* (Aug. 3, 2021) available at https://www.tysonfoods.com/news/news-releases/2021/8/tyson-foods-require-covid-19-vaccinations-its-us-workforce (last visited Sept. 27, 2021).
[65] Missouri Department of Health, *COVID-19 Data for: Barry County* (Oct. 17, 2021) available at https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/county.php
[66] *Id.*
[67] *See* https://covidactnow.org/us/missouri-mo/county/barry_county/?s=24351349 (last visited Oct. 17, 2021).
[68] *See* https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/county.php (last visited Oct. 17, 2021).
[69] *See* https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/county.php.
[70] *See* https://data.news-leader.com/covid-19-vaccine-tracker/missouri/lawrence-county/29109/ (last visited Oct. 17, 2021).

25

113.    What is more, in Christian County, MDH reports 10,319 cases of COVID-19 since approximate March of 2020.[71] Currently, 10,109 of those cases are considered "inactive" or "recovered" even though only 43.5% of the county is fully vaccinated.[72] Like the other two counties, data for Christian County shows most people do not die from COVID-19 with only 157 deaths being reported since March of 2020.

114.    Thus, MDH's data shows that even in counties with low vaccination rates, the overwhelming majority of people do not die from COVID-19, nor end up even being hospitalized. Yet, Tyson grossly exaggerates the specter of the virus, appealing to fear, not rationality, in a failed attempt to justify its unlawful mandate on its employees.

## J.    Missouri law forbids discrimination and retaliation

115.    Missouri's anti-discrimination laws (Missouri Human Rights Commission Act) mirror Title VII of the federal Civil Rights Act Section 213.055 RSMo.

116.    Missouri's anti-discrimination statutes forbid Tyson from discriminating and retaliating against employees based on their religious beliefs or medical conditions.

117.    The Missouri Human Rights Commission Act ("MHRCA") makes it illegal to discriminate in any aspect of employment because of an individual's race, color, religion, national origin, ancestry, sex, disability, or age. Specifically, under the MHRCA, an employer may not discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement,

---

[71] *See* https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/county.php
[72] *See https://data.news-leader.com/covid-19-vaccine-tracker/missouri/lawrence-county/29109/*

or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

118.   Likewise, the Missouri Human Rights Commission Act ("MHRCA") forbids and employer from engaging in a discriminatory practice with respect to the compensation, terms, conditions, privileges or employment because of an individual's race, creed, color, religion, sex, age, or national origin. See *Blackwell v. DaimlerChrystler Corp.*, 399 F. Supp. 2d 998 (E.D.Mo. 2005); *Hurst v. Kan. City, Mo. Sch. Dist.*, 437 S.W.3d 327 (Mo. App. 244); 328 S.W.3d 777 (Mo. App. 2010); *Baker v. Silver Oak Senior Living Mgmt. Co., L.C.*, 581 F.3d 684 (*th Cir. 2009).

119.   The MHRCA is a "comprehensive anti-discrimination statute," enacted to [s]afeguard all individuals within the state from discrimination because of race, creed, color, religion, sex, age, or national origin in connection with employment."

120.   The MHRCA provides that it is a discriminatory practice to "retaliate against an individual for filing a complaint of discrimination, participating in an investigation or hearing, or opposing discriminatory practices."

121.   Under the MHRCA any person who believes that they have been discriminated against by an employer may file a complaint of discrimination.

122.   The state purpose and intent of the MHRCA is to provide for execution within Missouri of the policies embodied in the federal rights laws.

123.   Ultimately, a claim brought under the MHRCA is analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964. *Tero v. Elliot Popham Pontiac, Oldsmobile, Buck & GMC Trucks, Inc.*, 173 F.3d 988, 933 (6th

Cir. 1999); *State ex rel. Diehl v. O'Malley*, 95 S.W.3d 82 (Mo. banc 2003); *Daugherty v. City of Md. Heights*, 231 S.W.3d 814 (Mo. banc 2007); *Watson v. CEVA Logistics U.S., Inc.* 619 F.3d 936 (8th Cir. 2010); *Shirrell v. St. Francis Med. Ctr.*, 24 F. Supp. 3d 851 (E.D. MO 2014); and *Wallace v. DTG Operations, Inc.*, 563 F.3d 357. Generally, we interpret the MHRCA similarly, if not identically, to Title VII, but we are not obligated to follow and we are not limited by federal law when interpreting the MHRCA.

124. Consequently, in construing and applying the MHRCA, decisions of federal courts addressing similar issues under Title VII (Americans with Disabilities Act) are helpful and potentially persuasive authority.

K. **Tyson's Accommodation Request System**

125. Tyson required employees to fill out an official form and turn it into the HR department for religious exemptions.

126. Tyson has also allowed for a religious accommodation letter to be sent to the HR department.

127. Tyson offered those who applied for an accommodation up to one year of unpaid leave of absence or until they received the vaccine. (A true and correct copy of Tyson's "*Explanation of Leave + Accommodation*" policy, is attached as "Exhibit B" and incorporated herein by reference; a true and correct copy of Tyson's letter to employees who request a medical or religious accommodation dated September 17, 2021, is attached as "Exhibit C" and incorporated herein by reference). There were informed that after one year they would be effectively terminated from their

28

position at Tyson. *Id.* Tyson employees were also informed that even if they did receive the vaccine their positions would not be guaranteed. *Id.*

128. In response to Plaintiff's religious accommodation request, his superiors told him that the request had been accepted.

129. Tyson has stated to Plaintiff that he must accept the accommodation as quickly as possible and if not accepted then on November 1, 2021, Tyson will be sending out separation letters. Tyson's HR department has stated that they need an answer by October 18 as to the acceptance of the accommodation. A true and correct copy of this email chain is attached hereto as "Exhibit D" and incorporated herein by reference.

130. Tyson's HR has stated that this accommodation may not even be available by November 1 as a way to pressure and coerce their employees to either take the vaccine or make a decision as quickly as possible.

**L.    COVID Vaccines Violate Plaintiff's Religious Beliefs**

131. Presently, all COVID-19 vaccines have been made use either in production or testing of fetal cell lines developed from tissues originally derived from aborted fetuses (see excerpt below).[73]



Los Angeles County
**COVID-19 VACCINE AND FETAL CELL LINES**

In various stages of vaccine development and manufacturing, some of the COVID-19 vaccines used cells originally isolated from fetal tissue (often referred to as fetal cells), some of which were originally derived from an aborted fetus. The use of fetal cell lines is a very sensitive and important topic within some faith communities and among individuals with concerns about the ethics of using materials derived in this way.

---

[73]    *See,* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines,* http://publichealth.lacounty.gov/media/Coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf    (last accessed August 26, 2021).

132.    For example, the Johnson & Johnson vaccine used fetal cell cultures, specifically PER.C6, a retinal cell line that was isolated from a terminated fetus in 1985.[74]

133.    In an interview with WREG, Dr. Steve Threlkeld, president of the medical staff at Baptist Hospital in Memphis, Tennessee acknowledged fetal cell lines used to produce or test the Johnson & Johnson COVID-19 vaccines "were actually recovered from an aborted fetus in the 70s or 80s and there are several of these cell lines."[75]

134.    As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293 was used during the research and development phase.[76] All HEK 293 cells are descended from tissue taken in 1973 from either an elective abortion or miscarriage[77] that took place in the Netherlands.[78]

135.    While the production of the vaccines did not reportedly require any new abortions, Plaintiff objects to receiving the COVID-19 vaccines on the basis that, even assuming the vaccines do confer a meaningful health benefit, that benefit is one from ill-gotten gains.

---

[74] *Are the vaccines made with fetal cells,* Institute for Clinical Systems Improvement, https://www.icsi.org/covid-19-vaccine-faq/are-the-mma-vaccines-made-with-fetal-cells/ (last accessed August 26, 2021), see also, Tennessee Department of Health, *Fact v. Fiction: Johnson & Johnson Vaccine* (2021) available at https://covid19.tn.gov/stay-informed/blogs/fact-v-fiction-johnson-johnson-vaccine/ (last visited Sept. 27, 2021) (acknowledging the Johnson & Johnson vaccine was developed from a fetal cell line).

[75] WREG, *State: Fetal cell lines, not fetal tissue, were used to make Johnson & Johnson vaccine* (March 5, 2021) available at https://www.wreg.com/news/state-fetal-cell-lines-not-fetal-tissue-was-used-to-make-johnson-johnson-vaccine/ (last visited Sept. 27, 2021).

[76] *See,* Nebraska Medicine, *You asked, we answered: Do the COVID-19 vaccines contain aborted fetal cells?* https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells (last visited on Aug. 26, 2021).

[77] *COVID-19 Vaccine and Fetal Cell Lines.*

[78] *Id.*

30

136.    Plaintiff believes any benefit the COVID-19 vaccines may confer, flows from the unjust exploitation of unborn human life. On this basis alone, Plaintiff refuses on religious grounds to accept or be forced to accept the COVID-19 vaccines.

**M.    Employers Who Have Failed to Provide Reasonable Accommodations for Vaccine Mandates Have Been Held Liable**

137.    The discouragement or denial of religious accommodations from employers' mandatory vaccine policies has been found unlawful, even when those mandates were proscribed by hospitals. Indeed, numerous employers have been sued and lost over forced vaccines. *See e.g. EEOC v. Mission Hosp. Inc.*, No. 1:16-cv-118-MOC-DL, 2017 WL 3392783 (W.D.N.C. Aug. 2017) [resulting in permanent injunction against the employer from improperly denying religious exemptions from mandated vaccines and requiring employer to pay $89,000 in damages]; *United States v. Ozaukee County,* No. 18-cv-343-pp (E.D. Wis. 2018) [resulting in a permanent injunction against the employer for failure to grant religious exemptions from compulsory vaccines and order payment of damages to employee].

138.    Likewise, in *EEOC v. Saint Vincent Health Center*, Civil Action No. 1:16-cv-234 (2016), the employer agreed to pay $300,000 to a class of six aggrieved former employees and provided substantial injunctive relief to settle a religious discrimination lawsuit based upon a failure to grant a religious exemption as part of a mandatory seasonal flu vaccination requirement for its employees.

139.    Moreover, in *EEOC v. Memorial Healthcare*, Civil Action No. 2:18-cv-10523 (2018), the defendant employer paid $74,418 ($34,418 in back pay, $20,000 in compensatory damages and $20,000 in punitive damages) for refusing to hire a

31

medical transcriptionist because of her religious beliefs against receiving flu shots and refusing to accommodate those beliefs.

140. In fact, as recently as 2018, the U.S. Equal Employment Opportunity Commission sued Nashville-based Saint Thomas Health, after the employer failed to make a reasonable religious accommodation for the flu vaccine. *EEOC v. Saint Thomas Health*, Civil Action No. 3:18-cv-00978 (M.D. Tenn. 2018).

141. The *Saint Thomas Health* case resulted in consent decree enjoining the employer from failing to provide religious accommodations to an employee's sincerely held religious beliefs unless such requests created an undue hardship. The decree also awarded the injured employee $75,000 in damages and directed the employer to issue the employee an apology letter.

## **COUNT I: DEFENDANT'S VIOLATION OF PUBLIC POLICY**

COMES NOW, Plaintiff and for Count I states as follows:

142. Plaintiff reincorporates by reference each and every allegation contained in paragraphs 1 through 141.

143. On or about September 26, 2021, Plaintiff filed a complaint with the Missouri Commission on Human Rights (MCHR).

144. Due to Defendant's actions, the investigation will not be completed within 180 days or before November 1, 2021. Defendant knew the forced vaccination policy of August 2021 that no proper investigation could be completed by the Missouri Human Rights Commission to prevent Defendant's religious discrimination.

32

145. That on or about October 23, 2021, Plaintiff's position, which Defendant had posted because of Plaintiff's religious beliefs and exemption to the COVID vaccination, is being filled.

146. The Defendant has demoted or changed Plaintiff's employment with the Defendant due to Plaintiff's religious beliefs and filing a complaint with MCHR.

147. Under the law, Plaintiff is allowed to file complaints with the State and Federal agencies without being penalized by his employer, the Defendant.

148. Because Plaintiff has filed his complaint and exercised his Constitutional rights, the Defendant has and will improperly harm the Plaintiff in changing or threatening to change his position.

149. As a direct result of Defendant's wrongful action, Plaintiff will suffer lost wages, lost bonus, loss in health coverage for himself and his family, loss of benefits, and physical, emotional, and mental anguish as injuries.

150. Defendant's conduct as described herein is intentional, willing, knowing, malicious and outrageous and warrant an award of punitive damages in the sum not less than $100,000.00.

**WHEREFORE**, Plaintiff respectfully prays for the following relief in Count I:

a. For declaratory relief that Defendant Tyson violated the Missouri law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

b. For declaratory relief that Defendant Tyson violated the law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

c. For injunctive relief enjoining Defendant Tyson, its officers, agents, servants, employees, attorneys, successors, and all persons in active concert or participation with it, from discriminating against Plaintiff by refusing to grant reasonable religious or health accommodations to its COVID-19 vaccination mandate;

d. For damage caused to Plaintiff by Defendant's actions described herein;

e. For punitive damage in excess of $100,000.00;

f. Award Plaintiff's attorneys' fees and costs of suit; and

g. Grant any such further relief as the Court deems necessary and proper in the public interest.

## COUNT II: DEFENDANT'S ASSAULT

151. Plaintiff hereby incorporates by reference the allegations contained in the paragraphs 1-150 as if fully set forth herein.

152. Under Missouri law, a person commits assault who "intentionally or knowingly causes another to reasonably fear imminent bodily injury."

153. Tyson has threatened intentional harmful and offensive contact upon Plaintiff, by way of imposing the COVID-19 vaccine mandate upon him, under penalty of being terminated from his employment.

154. Tyson's COVID-19 vaccine mandate caused Plaintiff to reasonably believe that Tyson was about to carry out the threat of harmful and offensive contact upon him, by way of forcing Plaintiff to inject and untested and potentially unsafe substance into his body.

155. Plaintiff did not consent to Tyson's conduct and does not consent to receiving the COVID-19 vaccine.

34

156.     Tyson's COVID-19 vaccine mandate has and continues to cause Plaintiff harm, including but not limited to by way of fear, anxiety, fright over being threatened, with the injection of an untested and potentially unsafe substance into the body, and the imminent loss of their income and livelihoods.

157.     Tyson's conduct alleged herein was a substantial factor in causing Plaintiffs' harm.

**WHEREFORE**, Plaintiff respectfully prays for the following relief in Count II:

a.   For declaratory relief that Defendant Tyson violated the Missouri law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

b.   For declaratory relief that Defendant Tyson violated the law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

c.   For injunctive relief enjoining Defendant Tyson, its officers, agents, servants, employees, attorneys, successors, and all persons in active concert or participation with it, from discriminating against Plaintiff by refusing to grant reasonable religious or health accommodations to its COVID-19 vaccination mandate;

d.   For damage caused to Plaintiff by Defendant's actions described herein;

e.   For punitive damage in excess of $100,000.00;

f.   Award Plaintiff's attorneys' fees and costs of suit; and

g.   Grant any such further relief as the Court deems necessary and proper in the public interest.

## COUNT III: DEFENDANT'S BREACH OF CONTRACT

158. Plaintiff hereby incorporates by reference the allegations contained in the paragraphs 1 through 157 as if fully set forth herein.

159. Plaintiff has fully performed the legal requirements for his employment with the Defendant.

160. Defendant has breached the employment contract with the Plaintiff in one or more of the following:

   a) Requiring Plaintiff to violate his deeply held religious belief on abortion in forcing the COVID vaccination mandate;

   b) Penalizing the Plaintiff for exercising his legal religious exemption to the COVID vaccination from unborn aborted babies;

   c) Changing Plaintiff's employment status with Defendant and depriving Plaintiff of earned salary, bonus, and benefits;

   d) Disclosing Plaintiff's private confidential medical information to unauthorized third parties; and

   e) Harassing and shaming the Plaintiff for his religious beliefs.

161. As a direct result of Defendant's breach of contract, Plaintiff sustained damage of loss wages, loss in bonus, loss in benefits, forced unpaid leave, and mental and physical anguish.

**WHEREFORE**, Plaintiff respectfully prays for the following relief in Count III:

   a. For declaratory relief that Defendant Tyson violated the Missouri law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

36

b. For declaratory relief that Defendant Tyson violated the law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

c. For injunctive relief enjoining Defendant Tyson, its officers, agents, servants, employees, attorneys, successors, and all persons in active concert or participation with it, from discriminating against Plaintiff by refusing to grant reasonable religious or health accommodations to its COVID-19 vaccination mandate;

d. For damage caused to Plaintiff by Defendant's actions described herein;

e. For punitive damage in excess of $100,000.00;

f. Award Plaintiff's attorneys' fees and costs of suit; and

g. Grant any such further relief as the Court deems necessary and proper in the public interest.

## COUNT IV – DEFENDANT'S INVASION OF PLAINTIFF'S PRIVACY

162. Plaintiff hereby incorporates by reference the allegations contained in the paragraphs 1 through 161 as if fully set forth herein.

163. On or about September 7, 2021, Defendant shared to unauthorized persons Plaintiff's private and confidential medical information regarding the COVID vaccination.

164. This disclosure of the private and confidential information was not authorized by the Plaintiff.

165. As a direct result of the Defendant's disclosures, Defendant has made additional disclosures concerning the Plaintiff including the posting of his current position with the Defendant because he did not take the Covid vaccination.

166. As a direct result of Defendant's improper disclosure of private and confidential medical information, Plaintiff has sustained mental anguish, harassment, embarrassment as well as will experience loss of wages, income, and benefits.

**WHEREFORE**, Plaintiff respectfully prays for the following relief in Count IV:

a. For declaratory relief that Defendant Tyson violated the Missouri law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

b. For declaratory relief that Defendant Tyson violated the law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

c. For injunctive relief enjoining Defendant Tyson, its officers, agents, servants, employees, attorneys, successors, and all persons in active concert or participation with it, from discriminating against Plaintiff by refusing to grant reasonable religious or health accommodations to its COVID-19 vaccination mandate;

d. For damage caused to Plaintiff by Defendant's actions described herein;

e. For punitive damage in excess of $100,000.00;

f. Award Plaintiff's attorneys' fees and costs of suit; and

g. Grant any such further relief as the Court deems necessary and proper in the public interest.

38

**COUNT V: IN THE ALTERNATIVE TO COUNT I, DEFENDANT'S VIOLATION OF THE MISSOURI HUMAN RIGHTS COMMISSION ACT RELIGIOUS DISCRIMINATION**

167.　Plaintiff hereby incorporates by reference the allegations contained in the paragraphs 1 through 166 as if fully set forth herein.

168.　Missouri Code of the Missouri Human Rights Commission Act ("MHRCA") states that "it is a discriminatory practice for an employer to … discharge any person or otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's … religion, …; or limit, segregate or classify an employee or applicants for employment in any way that would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect the status of an employee, because of … religion."

169.　"Any employee terminated in violation of this section may bring a civil action against the employee's employer." Missouri Human Rights Commission Act.

170.　Ultimately, a claim brought under the MHRCA is analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964. *Tero v. Elliot Popham Pontiac, Oldsmobile, Buck & GMC Trucks, Inc.*, 173 F.3d 988, 933 (6th Cir. 1999); *State ex rel. Diehl v. O'Malley*, 95 S.W.3d 82 (Mo. banc. 2003); *Daugherty v. City of Md. Heights*, 231 S.W.3d 814 (Mo. banc 2007); *Watson v. CEVA Logistics U.S., Inc.* 619 F.3d 936 (8th Cir. 2010); *Shirrell v. St. Francis Med. Ctr.*, 24 F. Supp. 3d 851 (E.D. MO 2014); and *Wallace v. DTG Operations, Inc.*, 563 F.3d 357.

39

171.   The Missouri Supreme Court has characterized this section of the Missouri Constitution as practically synonymous with the clauses of the first Amendment of the United States Constitution.

172.   Our constitutions place the freedom of belief beyond government control or interference so that the freedom to believe is absolute and inviolate. *Medicine Bird,* 63 S.W.3d at 762 It [also] includes the right to act, or to refrain from acting, in a manner inconsistent with one's religious beliefs. *Id.* While "the freedom to act is subject to reasonable control for the protection of others," here Plaintiff's failure to act, in the form of refusing to receive a COVID-19 vaccine, on religious grounds, is protected by the Missouri Constitution.

173.   The analysis of a religious accommodation claim begins with whether an employee has established a prima facie case of religious discrimination. *Tepper v. Potter,* 505 F.3d 508, 514 (6th Cir. 2007) [quoting *Smith v. Pyro Minning Co.,* 827 F.2d 1081, 1085 (6th Cir. 1987)]. *Tero v. Elliot Popham Pontiac, Oldsmobile, Buck & GMC Trucks, Inc.,* 173 F.3d 988, 933 (6th Cir. 1999); *State ex rel. Diehl v. O'Malley,* 95 S.W.3d 82 (Mo. banc. 2003); *Daugherty v. City of Md. Heights,* 231 S.W.3d 814 (Mo. banc 2007); *Watson v. CEVA Logistics U.S., Inc.* 619 F.3d 936 (8th Cir. 2010); *Shirrell v. St. Francis Med. Ctr.,* 24 F. Supp. 3d 851 (E.D. MO 2014); and *Wallace v. DTG Operations, Inc.,* 563 F.3d 357.

174.   To prevail on a claim of religious discrimination under the MHRCA, a plaintiff must present either direct evidence of discrimination or make a prima facie case of indirect discrimination. *Tepper v. Potter,* 505 F.3d 508, 515 (6th Cir. 2007) ("*Tepper*"). Where the discrimination claim is based on circumstantial evidence, a

burden-shifting framework is used, as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). This framework generally requires the following elements relating to the plaintiff: "(1) is a member of a protected group; (2) was subjected to an adverse employment action; (3) was qualified for the position; and (4) was treated less favorably than similarly-situate nonprotected employees." *Id.* "If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to offer evidence of legitimate, nondiscriminatory reason for its adverse action." *Tepper, supra,* 505 F.3d at 515.

175. The MHRCA states that an "employer" cannot discriminate on the basis of religion, defining an employer as "the state, any political or civil subdivision thereof, and persons employing eight (8) or more persons within the state, or any person acting as an agent of an employer, directly or indirectly."

176. The statutory definition imposes upon an employer the duty to make reasonable accommodations for religious observances short of incurring an undue hardship. *Reed v. UAW,* 569 F.3d 576, 579 (6th Cir. 2009) [citing *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 75 (1977)].

177. The State of Missouri has expressly committed to the principle of fair and equal employment opportunities for its citizens, regarding religious accommodations, defining a protected religious practice or belief as follows "Religious beliefs are not only those beliefs held by traditional, organized religions, but also include moral or ethical beliefs as to what is right or wrong which are sincerely held with the strength of traditional religious views."[79]

---

[79] *See*, Religious Accommodation Guidelines, available at
https://www.tn.gov/content/dam/tn/hr/documents/Religion_Accommodation_Guidelines.pdf

178. Plaintiff holds sincere religious beliefs that precludes him from receiving a COVID-19 vaccine. While there may be some who consider COVID-19 vaccines to be acceptable, no employer in Missouri, public or private, is permitted to decide for itself whose religious beliefs are valid, and whose are not.

179. As the Supreme Court has recognized, an employee's "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Red. Bd. Of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981); *See also, Church of Lukumi Bablu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

180. Once an employee has articulated his or her sincerely held religious objections to acceptance or receipt of the currently available COVID-19 vaccines, the proper inquiry is thus at its end as to that element.

181. Defendant's COVID-19 vaccine mandate, which threatens termination for non-compliant employees, discriminates against employees who do not wish to receive the vaccine on religious grounds.

182. Plaintiff has sought an exemption from Tyson's COVID-19 vaccine mandate on religious grounds.

183. Those who do not comply with Tyson's COVID-19 vaccine mandate, including employees such as Plaintiff who does so based on his sincerely held religious beliefs, are forced to go on one year of unpaid leave and Plaintiff could lose his current position with Defendant. Furthermore, noncomplying employees who do not receive a COVID-19 vaccine at the end of the leave of absence period, are promised nothing short of termination. This is no reasonable accommodation at all,

42

but rather a punitive measure taken against employees who choose to exercise their religious beliefs.

184.    Tyson was made aware of the conflict between its COVID-19 vaccine mandate on the one hand, and Plaintiff's religious beliefs on the other. Tyson responded by implementing an accommodation tantamount to disciplinary action by discharge against Plaintiff.

185.    As a result of Tyson's draconian vaccine mandate, most employees will be forced to seek alternative employment during the year and those that refuse the vaccination on religious grounds are unlikely to comply with the mandate within the year, and thus will ultimately be terminated. Furthermore, Plaintiff's position is not guaranteed upon his return.

186.    Tyson's failure to provide reasonable religious accommodations has injured and will continue to injure Plaintiff, by discriminatorily denying him income and by terminating his livelihood.

187.    Because Plaintiff will establish prima facie showing, the burden shifts to Tyson to show that it could not accommodate the Plaintiff's religious needs without undue hardship. *Tepper, supra*, 505 F.3d at 514.

188.    Tyson cannot make a showing of undue hardship, because it cannot show that affording Plaintiffs other accommodations (scheduled testing, masking, etc.) in the context of employer vaccination policies would impose an undue hardship.

189.    Tyson thus failed to consider any reasonable accommodations to Plaintiff.[80] Instead, the only accommodation provided by Tyson for a religious exemption is

---

[80] See EEOC Guidance for employers whose employees are unable to be vaccinated due to their sincerely held religious beliefs. *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*

43

one year of unpaid leave which is tantamount to termination, and a far cry from the "individualized" assessment required by the EEOC.[81]

190. As such, Tyson discriminated against the Plaintiffs based on their sincerely held religious beliefs, failed to provide a reasonable accommodation for Plaintiff who requested an accommodation exemption based on religious grounds, and therefore, violated the Missouri Human Rights Commission Act.

**WHEREFORE**, Plaintiff respectfully prays for the following relief in Count V:

a. For declaratory relief that Defendant Tyson violated the Missouri law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

b. For declaratory relief that Defendant Tyson violated the law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

c. For injunctive relief enjoining Defendant Tyson, its officers, agents, servants, employees, attorneys, successors, and all persons in active concert or participation with it, from discriminating against Plaintiff by refusing to grant reasonable religious or health accommodations to its COVID-19 vaccination mandate;

d. For damage caused to Plaintiff by Defendant's actions described herein;

e. For punitive damage in excess of $100,000.00;

f. Award Plaintiff's attorneys' fees and costs of suit; and

---

(the "COVID-19 Technical Assistance", https://www.eeoc.gov/newsroom/eeoc-issues-updated-covid-19-technicalassistance, last visited on September 26, 2021.
[81] *See supra*, at Section J, ¶¶ 103-110.

g. Grant any such further relief as the Court deems necessary and proper in the public interest.

DATED:

**APPLEBY AND HEALY, PC.**
**/s/** John L. Young

John L. Young, MOBAR #36718
119 North Second St.
P.O. Box 158
Ozark, MO 65721
Phone: (417) 581-2411
Fax:: (417) 581-2447
Email:  jyoung@ApplebyHealy.com
**ATTORNEYS FOR PLAINTIFF**

45

STATE OF MISSOURI )
)SS.
COUNTY OF Christus )

On the 25-th day of October, 2021, Plaintiff, Clifton Reese, appeared before me and states under oath that the facts and allegations as stated in the above Petition are true and correct to the best of his knowledge, information, and belief.

_____
Clifton Reese

Subscribed and sworn before me on this 25th day of October, 2021.

_____
Notary Public

JOHN L. YOUNG
Notary Public, Notary Seal
State of Missouri
Christian County
Commission # 13439213
My Commission Expires 06-06-2022

46

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

## IN THE CIRCUIT COURT OF BARRY COUNTY
## STATE OF MISSOURI

| | | |
|---|---|---|
| **CLIFTON REESE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.:** |
| | ) | |
| **TYSON FOODS, INC.,** | ) | |
| **a corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUCTION

COMES NOW, Clifton Reese, through attorney of record John L. Young of Appleby Healy, Attorney at Law, P.C., and moves the court, pursuant to Rule 92.02 of the Missouri Rules of Civil Procedure, for a temporary restraining order and preliminary injunction in the above-entitled cause of action and joining Defendant Tyson Foods Inc, its agents, servants, employees, and attorneys, or anyone acting on Defendant's behalf and further states:

1. Defendant seeks to change Plaintiff's deeply held religious belief against the COVID-19 vaccination and Defendant's mandatory COVID-19 vaccination for continued employment by placing him on permanent leave without pay beginning November 1, 2021.

2. Unless restrained, Defendant Tyson Foods will immediately force Plaintiff on leave without pay, having loss in his current employment benefits, loss of salary, pay, and not receive his earned annual bonus due to his exercise of his religious objection to the mandatory COVID-19 vaccination policy imposed by the Defendant.

3. Immediate and irreparable injury, loss, and damage result to the Plaintiff by reasons of the threatened action of the Defendant, as more particularly appears in the verified petition filed herein and the attached affidavit of the Plaintiff Clifton Reese.

4. The Plaintiff has no adequate remedy under the law.

5. If this temporary restraining order and preliminary injunction be granted, the injury, if any to Defendant herein, if found judgment be in the favor of the Defendant, will be inconsiderable compared to damage caused by Plaintiff by loss of his employment.    Plaintiff is requesting maintaining the status quo until further hearing on the merits of his claim.

6. Plaintiff further moves the court that the trial of this cause on the merits be advanced and consolidate with hearing of this Motion for Preliminary Injunction.

7. Because Plaintiff is requesting the status quo be maintained, no bond should be required.

WHEREFORE, Plaintiff hereby requests the court to issue temporary restraining order and preliminary injunction against the Defendant concerning any change in the Plaintiff's employment due to his religious exemption to the COVID-19 vaccination.; for Plaintiff's attorneys' fees; for cost; and any other relief the court deems just and proper under the circumstances.

**APPLEBY AND HEALY, PC.**
/s/ John L. Young

_____
John L. Young, MOBAR #36718
119 North Second St.
P.O. Box 158
Ozark, MO 65721
Phone: (417) 581-2411
Fax:: (417) 581-2447
Email:  jyoung@ApplebyHealy.com
**ATTORNEYS FOR PLAINTIFF**

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

**IN THE CIRCUIT COURT OF BARRY COUNTY
STATE OF MISSOURI**

| | | |
|---|---|---|
| **CLIFTON REESE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.:** |
| | ) | |
| **TYSON FOODS, INC.,** | ) | |
| a corporation, | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>AFFIDAVIT OF PLAINTIFF</u>**

COMES NOW Plaintiff Clifton Reese who states under oath to the best of his knowledge and belief the following:

1. Plaintiff Clifton Reese has personal knowledge of events described in this affidavit and he is over the age of 18.

2. Defendant seeks to change Plaintiff's deeply held religious belief against the COVID-19 vaccination and Defendant's mandatory COVID-19 vaccination for continued employment by placing him on permanent leave without pay beginning November 1, 2021.

3. Unless restrained, Defendant Tyson Foods will immediately force Plaintiff on leave without pay, having loss in his current employment benefits, loss of salary, pay, and not receive his earned annual bonus due to his exercise of his religious objection to the mandatory COVID-19 vaccination policy imposed by the Defendant.

4. Immediate and irreparable injury, loss, and damage result to the Plaintiff by reasons of the threatened action of the Defendant, as more particularly appears in the verified petition filed herein and the attached affidavit of the Plaintiff Clifton Reese.

5. The Plaintiff has no adequate remedy under the law.

6. If this temporary restraining order and preliminary injunction be granted, the injury, if any to Defendant herein, if found judgment be in the favor of the Defendant, will be inconsiderable compared to damage caused by Plaintiff by loss of his employment. Plaintiff is requesting maintaining the status quo until further hearing on the merits of his claim.

7.  Plaintiff further moves the court that the trial of this cause on the merits be advanced and consolidate with hearing of this Motion for Preliminary Injunction.

8.  Because Plaintiff is requesting the status quo be maintained, no bond should be required.

9.  Affiant further sayeth not.

_____
Clifton Reese

STATE OF MISSOURI     )
                        )SS.
COUNTY OF _Christian_ )

On the _25st_ day of October, 2021, Plaintiff, Clifton Reese, appeared before me and states under oath that the facts and allegations as stated in the above Affidavit are true and correct to the best of his knowledge, information, and belief.

Subscribed and sworn before me on this _25th_ day of _October_, 2021.

_____
Notary Public

JOHN L. YOUNG
Notary Public, Notary Seal
State of Missouri
Christian County
Commission # 13439213
My Commission Expires 06-06-2022

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

**IN THE CIRCUIT COURT OF BARRY COUNTY**
**STATE OF MISSOURI**

| | |
|---|---|
| **CLIFTON REESE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Case No.:** |
| | ) |
| **TYSON FOODS, INC.,** | ) |
| **a corporation,** | ) |
| **SERVE AT: Registered Agent** | ) |
| **CT Corporation System** | ) |
| **120 S. Central Avenue** | ) |
| **Clayton, MO 63105** | ) |
| | ) |
| **Defendant.** | ) |

**REQUEST FOR APPOINTMENT OF SPECIAL PROCESS SERVER**

COMES NOW, Clifton Reese, Plaintiff, by and through his attorney of record John L. Young of Appleby Healy, Attorneys at Law, P.C., and requests that pursuant to Rule 54.14(a)(2) of the Missouri Rules of Civil Procedure the Court appoint a Special Process Server, namely Mark Rauss or any other representative of AA Process servers, LLC (a natural person of lawful age who is not a party to this action), to serve the Summons and Petition to Defendant Tyson Foods, Inc. through its Registered Agent CT Corporation in this cause. This appointment as special process server does not include the authorization to carry a concealed weapon in the performance of this duty.

**APPLEBY AND HEALY, PC.**
**/s/** John L. Young

_____
John L. Young, MOBAR #36718
119 North Second St.
P.O. Box 158
Ozark, MO 65721
Phone: (417) 581-2411
Fax:: (417) 581-2447
Email:  jyoung@ApplebyHealy.com
**ATTORNEYS FOR PLAINTIFF**

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

**IN THE CIRCUIT COURT OF BARRY COUNTY**
**STATE OF MISSOURI**

| | |
|---|---|
| **CLIFTON REESE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Case No.:** |
| | ) |
| **TYSON FOODS, INC.,** | ) |
| **a corporation,** | ) |
| **SERVE AT: Registered Agent** | ) |
|     **CT Corporation System** | ) |
|     **120 S. Central Avenue** | ) |
|     **Clayton, MO 63105** | ) |
| | ) |
| **Defendant.** | ) |

## ORDER APPOINTING SPECIAL PROCESS SERVER

The Court, having reviewed the request herein, hereby appoints Mark Rauss or any other representative of AA Process Servers, LLC to serve the Summons and Petition to Defendant Tyson Foods, Inc.'s Registered Agent CT Corporation in this matter. This appointment as special process server does not include the authorization to carry a concealed weapon in the performance of this duty.

_____
Judge / Clerk

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

### IN THE CIRCUIT COURT OF BARRY COUNTY
### STATE OF MISSOURI

CLIFTON REESE,                )
                             )
    Plaintiff,        )
                             )
vs.                          ) Case No.:
                             )
TYSON FOODS, INC.,           )
a corporation,               )
SERVE AT: Registered Agent   )
    CT Corporation System   )
    120 S. Central Avenue   )
    Clayton, MO 63105       )
                             )
    Defendant.        )

```
FILED

OCT 27 2021

CRAIG WILLIAMS
CIRCUIT CLERK, BARRY COUNTY, MO
```

## ORDER APPOINTING SPECIAL PROCESS SERVER

The Court, having reviewed the request herein, hereby appoints Mark Rauss or any other representative of AA Process Servers, LLC to serve the Summons and Petition to Defendant Tyson Foods, Inc.'s Registered Agent CT Corporation in this matter. This appointment as special process server does not include the authorization to carry a concealed weapon in the performance of this duty.

_____
Judge / Clerk

Electronically Filed - Barry - October 27, 2021 - 09:56 AM

119 North Second Street
P.O. Box 158
Ozark, MO 65721



Phone: (417) 581-2411
Fax:    (417) 581-2447

# APPLEBY HEALY
### ATTORNEYS AT LAW, P.C.

*Local Lawyers helping local people since 1924*

October 27, 2021

Barry County Circuit Clerk
102 West St. #1
Cassville, MO 65625

Re: Clifton J. Reese v. Tyson Foods, Inc. (Case No.: 21BR-CC00091)

Dear Clerk:

Please issue a summons for the Petition filed with the court on or about October 26, 2021.

Tyson Foods, Inc.
R/A CT Corporation System
120 S. Central Ave.
Clayton, MO 63105

Thank you for your attention to this matter.

Sincerely,

Amber Galindo
Paralegal



# IN THE 39TH JUDICIAL CIRCUIT, BARRY COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>DAVID ALLEN COLE | **Case Number:  21BR-CC00091** |
| Plaintiff/Petitioner:<br>CLIFTON JOHN REESE | Plaintiff's/Petitioner's Attorney/Address<br>JOHN LUTHER YOUNG<br>901 EAST ST. LOUIS<br>SUITE 404<br>SPRINGFIELD, MO  65806 |
| vs. | |
| Defendant/Respondent:<br>TYSON FOODS INC | Court Address:<br>102 WEST STREET |
| Nature of Suit:<br>CC Injunction | STE 1<br>CASSVILLE, MO  65625 |
| | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to:  **TYSON FOODS INC**
                          **Alias:**

**R/A CT CORPORATION SYSTEM**
**120 SOUTH CENTRAL AVENUE**
**CLAYTON, MO  63105**

*COURT SEAL OF*

*BARRY COUNTY*

**You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.**

_____October 27, 2021_____            Craig Williams by Kami Stanton
          Date                                              Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer**: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to:

_____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____            _____
    Printed Name of Sheriff or Server                Signature of Sheriff or Server
                **Must be sworn before a notary public if not served by an authorized officer:**

                            Subscribed and sworn to before me on _____ (date).

*(Seal)*

                            My commission expires: _____            _____
                                                              Date                              Notary Public

**Sheriff's Fees, if applicable**

| | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (06-18) SM30 (SMCC) *For Court Use Only*: Document Id # 21-SMCC-789          1 of 1          Civil Procedure Form No. 1; Rules 54.01 – 54.05,<br>54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 3:21-cv-05087-RK   Document 1-1   Filed 10/28/21   Page 56 of 120

**21BR-CC00091 Reese v. Tyson Foods, Inc.**

David Cole   to  Daryl Rose, J Craig Williams, Kami Stanton          10/27/2021 01:33 PM

| From | David Cole/39/Courts/Judicial |
| To | Daryl Rose/39/Courts/Judicial@JUDICIAL, J Craig Williams/39/Courts/Judicial@JUDICIAL, Kami Stanton/39/Courts/Judicial@JUDICIAL |

Please make the following entry.

10/27/2021  In order to avoid the appearance of impropriety, Court recuses. Clerk to notify Supreme Court for assignment. SO ORDERED /s/ David A. Cole

David A. Cole
Circuit Judge
39th Judicial Circuit
Barry County Circuit Court
102 West Street, Suite 6
Cassville, Mo 65625

417-847-3133 Ext. 2255
david.cole@courts.mo.gov

 **IN THE 39th JUDICIAL CIRCUIT, BARRY COUNTY, CASSVILLE, MISSOURI**

| Judge or Division:<br>DAVID A. COLE | Case Number:<br>21BR-CC00091 | |
|---|---|---|
| ☒ Plaintiff/Petitioner: | Date of Hearing (if set): | **FILED**<br>**OCT 27 2021**<br>CRAIG WILLIAMS<br>CIRCUIT CLERK BARRY COUNTY, MO<br>(Date File Stamp) |
| ☐ State of Missouri | | |
| Defendant/Respondent: TYSON FOODS INC | | |

## Judicial Transfer Request
### Failure to fully complete this form will delay consideration of the request.

Judge ___David_____ ____Allen_____ ___Cole_____ being replaced due to:
     (First)            (Middle)          (Last)

  ☐ disqualification  ☒ by Judge's own motion  ☐ by motion of Defendant/Respondent

                  ☐ by motion of Plaintiff/Petitioner  ☐ this is a disqualification of a special judge

Judge is unavailable due to:_ Recusal _____

Date(s) assignment is needed:_ CC Injuntion _____

Description of the case:_____

_____

_____

---

☐ Criminal Case:

  Defendant/Respondent is presently  ☐ incarcerated  ☐ released on bail or own recognizance

  ☐ Preliminary hearing waived. Circuit Court arraignment date:_____

  Defendant/Respondent's Attorney:_____

  Criminal charge(s):_____

---

☒ Civil Case:

  Plaintiff/Petitioner's Attorney:_ John Luther Young 36718 _____

  Defendant/Respondent's Attorney:_____

---

☐ Requesting an ASTAR/NCSI Judge (Cases that involve science or technology.)

☐ Requesting a Complex Litigation Judge.

---

Please assign a judge to this case.

   __October 27, 2021___              _____
         Date                               Presiding Judge Signature

Send this form to the attention Court en Banc:

| E-mail | or | Fax | or | Mail |
|---|---|---|---|---|
| Judge.Transfers@courts.mo.gov | | (573) 751-2809 | | Supreme Court of Missouri<br>P.O. Box 150<br>Jefferson City, MO 65102 |

 **CT Corporation**

**TO:** Amanda Rupert
Tyson Foods, Inc.
2200 W DON TYSON PKWY # 131
SPRINGDALE, AR 72762-6901

**RE:** **Process Served in Missouri**

**FOR:** Tyson Foods, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: CLIFTON JOHN REESE // To: Tyson Foods, Inc. |
| **DOCUMENT(S) SERVED:** | Attachment(s), Exhibit(s), Motion, Affidavit |
| **COURT/AGENCY:** | 39TH JUDICIAL CIRCUIT, BARRY COUNTY, MO<br>Case # 21BRCC00091 |
| **NATURE OF ACTION:** | Employee Litigation |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Clayton, MO |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 10/28/2021 at 10:46 |
| **JURISDICTION SERVED :** | Missouri |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after receipt, exclusive of the day of service (Document(s) may contain additional answer dates) |
| **ATTORNEY(S) / SENDER(S):** | John L. Young<br>APPLEBY AND HEALY, PC.<br>119 North Second St.<br>P.O. Box 158<br>Ozark, MO 65721<br>417-581-2411 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 10/28/2021, Expected Purge Date: 11/02/2021 |
| | Image SOP |
| | Email Notification,  Brook Brewer  brook.brewer@tyson.com |
| | Email Notification,  Jane Duke  jane.duke@tyson.com |
| | Email Notification,  Amanda Rupert  amanda.rupert@tyson.com |
| | Email Notification,  Chevon Fuller  chevon.fuller@tyson.com |
| | Email Notification,  Adam Deckinger  adam.deckinger@tyson.com |
| | Email Notification,  Brittany Pettingill  brittany.pettingill@tyson.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System |

 CT Corporation

**Service of Process Transmittal**
10/28/2021
CT Log Number 540494020

**TO:**     Amanda Rupert
Tyson Foods, Inc.
2200 W DON TYSON PKWY # 131
SPRINGDALE, AR 72762-6901

**RE:**     **Process Served in Missouri**

**FOR:**   Tyson Foods, Inc.  (Domestic State: DE)

120 South Central Avenue
Clayton, MO 63105
866-331-2303
CentralTeam1@wolterskluwer.com

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



## PROCESS SERVER DELIVERY DETAILS

**Date:**                    Thu, Oct 28, 2021

**Server Name:**             Mark Rauss

| Entity Served | TYSON FOODS, INC. |
|---|---|
| Case Number | 21BR-CC009091 |
| Jurisdiction | MO |





# IN THE 39TH JUDICIAL CIRCUIT, BARRY COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>DAVID ALLEN COLE | Case Number: 21BR-CC00091 |
| Plaintiff/Petitioner:<br>CLIFTON JOHN REESE<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>JOHN LUTHER YOUNG<br>901 EAST ST. LOUIS<br>SUITE 404<br>SPRINGFIELD, MO 65806 |
| Defendant/Respondent:<br>TYSON FOODS INC | Court Address:<br>102 WEST STREET |
| Nature of Suit:<br>CC Injunction | STE 1<br>CASSVILLE, MO 65625 |

*115207*

(Date File Stamp)

## Summons in Civil Case

The State of Missouri to: TYSON FOODS INC
Alias:

R/A CT CORPORATION SYSTEM
120 SOUTH CENTRAL AVENUE
CLAYTON, MO 63105

**COURT SEAL OF**

*BARRY COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

| October 27, 2021 | Craig Williams by Kami Stanton |
|---|---|
| Date | Clerk |

Further Information:

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to:
_____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____     _____
Printed Name of Sheriff or Server     Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____
    Date             Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (06-18) SM30 (SMCC) For Court Use Only Document Id # 21-SMCC-789 1 of 1 Civil Procedure Form No. 1; Rules 54.01 – 54.05, 54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 3:21-cv-05087-RK Document 1-1 Filed 10/28/21

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

IN THE CIRCUIT COURT OF BARRY COUNTY
STATE OF MISSOURI

| | |
|---|---|
| CLIFTON REESE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No.: |
| | ) |
| TYSON FOODS, INC., | ) |
| a corporation, | ) |
| SERVE AT: Registered Agent | ) |
|         CT Corporation System | ) |
|         120 S. Central Avenue | ) |
|         Clayton, MO 63105 | ) |
| | ) |
| Defendant. | ) |

## PETITION FOR INJUNCTIVE AND DECLARATORY RELIEF

### INTRODUCTION

1. Plaintiff Clifton Reese (hereinafter "Plaintiff"), seeks relief from Defendant Tyson Foods Inc.'s ("Tyson")'s pattern of discrimination against employees who request religious or medical accommodations from Tyson's COVID-19 vaccination mandate policy.

2. Tyson addresses a very remote risk: the at-employment risk of asymptomatic deadly spread of Covid-19 to fellow employees by a method (vaccination), that actually poses a higher risk of deadly spread of Covid-19 than asymptomatic spread, when self-quarantining the symptomatic and testing more easily suffices.

3. Missouri law and the Missouri Human Rights Commission Act, compels Tyson to accommodate employees rather than discriminate against them when those employees seek medical or religious reasons for not taking a compelled medical treatment. Instead, Tyson treats them as disabled employees who must be

terminated. Rather than complying with the Missouri law, Tyson responded to their employees seeking medical or religious exemptions, by informing those employees that they would be effectively terminated on November 1, 2021 and placed on a one-year unpaid leave of absence with no assurance that they would be allowed to return to the workplace in one year.

4. Tyson's unlawful actions leave Plaintiff with the impossible choice of suffering a physical assault and uninvited invasion of his body by receiving the experimental COVID-19 vaccine, at the expense of his religious beliefs, bodily autonomy, medical privacy, and at risk to his health, or losing his livelihood and being unable to provide food, housing, and support for himself and his family.

5. The Faustian bargain is no bargain at all and is precisely what is forbidden by the Missouri law. The relief sought herein is precisely what both those laws expressly approve: equitable relief.

6. Tyson's actions violate Missouri law by failing to provide reasonable accommodations, as well as by retaliating against employees who engaged in protected activity. The plaintiff only seeks this court to order that Tyson comply with the laws protecting the rights of Missouri against precisely such catch-22 "choices".

## PARTIES

7. Plaintiff Clifton Reese is a manager at Tyson's complex in Monett, Missouri ("Monett complex") who has requested an exemption from the mandatory vaccination on religious grounds. He is a citizen of Missouri and a resident of Barry County, Missouri.

2

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

8.  Plaintiff has been employed with Tyson since September 3, 2013, with advancement in his employment. He has received advancement with Defendant, pay increases, and bonuses.

9.  Plaintiff has declined to receive the mandatory vaccination for religious reasons. His religious exemption was granted by Defendant.

10. Defendant Tyson Foods, Inc. ("Tyson") together with its subsidiaries, is a corporation that operates as a worldwide food processing and marketing company. Defendant has a plant in Barry County, Missouri. All actions described herein of Defendant's employees were with the scope of their employment with Defendant. Defendant is liable for its employees actions.

11. Tyson is the world's second largest processor and marketer of chicken, beef, and pork. Tyson employs approximately 139,000 people in the United States and operates six facilities in the state of Missouri. Tyson's facilities throughout Missouri employ thousands of people. A key complex at issue in this case is Tyson's complex at Monett, located in Barry County, Missouri.

12. At all relevant times, Tyson knew or should have known of the laws, policies, practices, and conditions alleged herein.

13. Defendant has threatened to force leave without pay and loss of employment unless immediate relief is granted. Plaintiff's damage exceeds $25,000.00. Plaintiff seeks a temporary restraining order and permanent injunction against Defendant.

14. In September, 2021, Tyson requests Plaintiff to take the COVID-19 vaccination. When Plaintiff did not agree, Tyson stated that Plaintiff's position would be posted. "Posted" means his job is open for others in the company. When filled with another,

3

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

Plaintiff would lose his position. As of October 23, 2021, Plaintiff has been informed his position will be filled by another on November 1, 2021.

## JURISDICTION AND VENUE

15. This Court has personal and subject matter jurisdiction over this action.

16. This Court has personal jurisdiction over Defendant Tyson because Tyson transacts its business in Missouri, and the wrongful conduct and resulting injuries alleged herein substantially occurred in this state. Defendant's Registered Agent is C T Corporation System and can be served at 120 S. Central Ave., Clayton, MO 63105.

17. Venue is proper in this judicial district because the cause of action arises primarily from Tyson's Monett complex situated in Barry County, Missouri.

## FACTS

A. **Plaintiff's Employment with Defendant**

18. Plaintiff began his employment with Defendant on September 3, 2013.

19. Plaintiff received advancement and salary increases. His current title is Senior Live Production Manager. His base salary is $113,907.75 per year with stock matching, health insurance coverage for himself and his family, comp time, vacation time, and other benefits.

20. Plaintiff has had no negative employment issues with Defendant.

21. Plaintiff has complied with Defendant's COVID requirements of wearing a face mask, social distancing, temperature checks, and when requested, taking a COVID test.

22. There have been no COVID issues in Plaintiff's employment with the Defendant.

4

23.     On or about August 2, 2021, the Defendant's CEO and management mandated COVID vaccinations for all of Defendant's employees.

24.     In response, Monett complex Human Resources Manager, April Fritz, started making medical private confidential health inquiries to the employees at the Monett complex for Defendant.

25.     In Ms. Fritz's communications, she would request to other private confidential medial information including information of the Plaintiff's confidential medical health.

26.     These reports also were circulation to unauthorized third parties by Ms. Fritz on who was not vaccinated at the Monett complex.

27.     Ms. Fritz at all times as well as all other named employees of Defendant were acting within the scope of their employment following Defendant's publicized procedures.

28.     Defendant is liable for its employees' acknowledging vaccination before November 1, 2021.

29.     Since and during these conversations, Defendant employees declared that if Plaintiff made a religious or medical exemption to the COVID vaccination his job would be immediately posted for another.

30.     Plaintiff in his response to Defendant employees stated he had several religious concerns about the Covid vaccination. He argued to file for religious exemption.

31.     Defendant employee discouraged Plaintiff from declaring a religious exemption and encouraged him to be vaccinated.

32.     Defendant posted Plaintiff's position for hiring or about September 7, 2021.

5

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

33. Defendant employee immediately informed Plaintiff he would be on a forced leave of absence without pay beginning November 1, 2021.

34. Plaintiff is scheduled to have performance bonus. Defendant employee reported he cannot receive his performance bonus.

35. Plaintiff also has unused comp time with Defendant has reported he would also lose.

36. On or about September 26, 2021, Plaintiff filed a complaint with the Missouri Commission of Human Rights.

37. Upon Defendant's notice of this complain by the Missouri Human Rights Commission, Plaintiff was questioned by Ms. Fritz and interrogated as to why he filed the complaint.

38. Prior to the filing, Plaintiff was being treated unfriendly. After filing, he was treated harshly. His supervisor failed to respect Plaintiff's performance of his job duties and notice of emergencies.

39. That on or about September 7, 2021, Ms. Fritz listed publicly Plaintiff and other employees who had not been COVID vaccinated.

40. There was sent in general circulation with others receiving Plaintiff's private confidential medical information.

41. Because Plaintiff did not provide proof of card vaccination nor had he not yet made his personal medical health decision, Defendant's employees had continued contact, communication, and harassment of the Plaintiff to compel him to take the COVID vaccination.

42. Plaintiff has been a model Christian employee for the Defendant.

6

43.     Plaintiff has performed beyond normal duties with the Defendant resulting in advancement.

44.     Plaintiff has performed his employment control duties except for the COVID vaccine, which he declared to religious belief and filing valid legal religious exemption.

**B.     Coronavirus and Tyson's Response**

45.     The novel coronavirus SARS-CoV-2, which causes the disease COVID-19, is a contagious virus which spreads person-to-person, including through the air.

46.     Nearly two years ago, on January 15, 2020, a Washington state resident became the first person in the United States with a confirmed case of SARS-CoV-2.

47.     In the spring of 2020, Tyson began implementing mitigation procedures for its workforce, including several of the following requirements for its employees like masks, face shields, social distancing, temperature checks, COVID-19 testing,[1] and self-quarantines.[2] Tyson initially made several accommodations for hourly employees.[3] For example, in March of 2020, the company relaxed attendance policies in its plants by "[] eliminating any punitive effect for missing work due to illness."[4]

---

[1] Tyson Foods, *Tyson Foods CEO Provides Update on Efforts to Address COVID-19* (April 6, 2021) available at https://www.tysonfoods.com/news/news-releases/2020/4/tyson-foods-ceo-provides-update-efforts-address-covid-19 (last visited Sept. 27, 2021); Tyson Foods; *Why Tyson Has Taken a Leading Position on COVID-19 Testing* (July 1, 2021) available at https://thefeed.blog/2020/07/01/covid-19-testing-at-tyson-foods/ (last visited Sept. 27, 2021).
[2] Tyson Foods, *Protecting Team Members and Our Company; Ensuring Business Continuity* (March 17, 2020) available at https://www.tysonfoods.com/news/news-releases/2020/3/protecting-team-members-and-our-company-ensuring-business-continuity (last visited Sept. 27, 2021); Chattin Cato, *Tyson Team Innovates to Make Face Shields for Frontline Workers* (July 6, 2021) available at https://thefeed.blog/2020/07/06/tyson-innovates-to-make-face-shields-for-frontline-workers/ (last visited Sept. 27, 2021).
[3] *Id.*
[4] *Id.*

7

48.     Tyson experienced substantial success reducing the risk of COVID-19 spread through self-quarantining for the symptomatic and testing for the asymptomatic persons. As even Anthony Fauci admits, the risk of asymptomatic spread is very rare and very low, with experts estimating it is largely a non-existent risk. At worst, asymptomatic risk of employees spreading lethal COVID-19 is less than one-in-a-million. Even in that one-in-a-million risk, testing easily addresses asymptomatic risk without requiring bodily invasion against a person's will of an experimental drug with unknown long term side effects due to its novel mRNA methodology, with the worst short-term adverse events reported in the government's VAERS database in American history, and whose administration offends the conscience of millions of Americans' deeply held spiritual beliefs and religious faith due to the use of aborted fetal cells in its testing, development and production of each of these experimental vaccines.

**C.    Tyson's Unlawful Vaccine Mandate**

49.     The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech vaccine on December 1, 2020. One week later a second EUA for the Moderna COVID-19 vaccine. Finally, the FDA issued a EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021.

50.     Though the FDA has approved the use of a currently unavailable vaccine for future use, the only vaccines widely available for use in the United States are these three experimental, investigative and unlicensed drugs, all of which were either developed, tested, or produced with the use of fetal cells from aborted fetuses.

8

51.     Since the rollout of the vaccines, data increasingly show the vaccines do not prevent

infection, do not prevent transmission, and do prevent illness. Indeed, countries

with the most aggressive, expansive use of the vaccines see record-setting infection

rates and continuing high illness rates.    Governmental authorities revised their

definition of the word "vaccine" itself in order to continue to label these

experimental drugs with novel ingredients, "vaccines" because they fail to meet the

test of traditionally defined vaccines which actually inoculated against infection

and prevented transmission, neither of which this drug can any longer claim credit

for. This reflects the fact there has never been a successful coronavirus vaccine in

history due to the viral evolution each virus mutates into.

52.     On approximately August 3, 2021, Tyson publicly announced it would require all

"[]team members at U.S. office locations to be fully vaccinated by October 1,

2021."[5] (A true and correct copy of Tyson's August 3, 2021 COVID-19 vaccine

mandate, is attached as *Exhibit A*, and incorporated herein by reference). Tyson also

announced that all other team members, thus including plant team members, would

be required to be vaccinated by November 1, 2021.[6]

53.     Tyson publicly stated that "Exceptions to the vaccination mandate will involve

workers who seek medical or religious accommodation."[7]

54.     In announcing the mandate, Tyson CEO Donnie King justified the decision by

claiming, "[]the U.S. Centers for Disease Control and Prevention is reporting *nearly*

---

[3] Tyson Foods, *Tyson Foods to Require COVID-19 Vaccination for its U.S. Workforce* (Aug. 3, 2021) available at
https://www.tysonfoods.com/news/news-releases/2021/8/tyson-foods-require-covid-19-vaccinations-its-us-
workforce (last visited Sept. 27, 2021).
[6] *Exhibit A*.
[7] *Id.*

9

*all hospitalizations and deaths* in the U.S. are among those who are unvaccinated" (emphasis added).[8] As set forth herein below, Mr. King's statement was false.

**D.** **The Risks Associated with Coronavirus**

55. Coronavirus presents a risk primarily to individuals aged 85[9] or older and those with comorbidities such hypertension and diabetes.[10]

56. The vast number of deaths associated with COVID-19 occur in those over the age of 55.[11] Within the most heavily impacted age group (age 85 and up), only 13.3% of deaths from February 2020 to February 2021 were attributed to COVID-19.[12]

57. One of the most useful measures for calculating the risk of dying from a virus is the infection-fatality rate ("IFR"). The IFR is calculated by dividing the number of COVID deaths by the number of COVID infections. It attempts to answer the critical question: If I get sick, what is the chance that I will die?" The Center for Disease Control and Prevention estimates the IFR for the bulk of most working-age adults is exceedingly low.[13] For adults under age 50, the CDC's "current-best estimate" is that 500 people will die per 1,000,000 infections nationwide.[14] In other

---

[8] Donnie King, *Our Next Step in the Fight Against the Pandemic* (Aug. 3, 2021) available at https://web.archive.org/web/20210803143911/https://thefeed.blog/2021/08/03/our-next-step-in-the-fight-against-the-pandemic/ (last visited Sept. 27, 2021).

[9] Mayo Clinic, *COVID-19: Who's at higher risk of serious symptoms* (Aug. 24, 2021) available at https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-who-is-at-risk/art-20483301?p=1 (last visited on Aug. 28, 2021).

[10] Wern Hann, et. al., *Comorbidities in SARS-CoV-2 Patients: a Systematic Review and Meta-Analysis,* (February 2021) available at https://journals.asm.org/doi/10.1128/mbio.03647-20?permanently=true& (last visited on Aug. 28, 2021).

[11] Heritage Foundation, *COVID-19 Deaths by Age,* Heritage Foundation (Feb. 17, 2021) available at https://datavisualizations.heritage.org/public-health/covid-19-deaths-by-age/ last visited (Sept. 1, 2021); *See also, See, COVID-19: Who's at higher risk of serious symptoms.*

[12] *Id.*

[13] CDC, *COVID-19 Pandemic Panning Scenarios,* Centers for Disease Control and Prevention (March 19, 2021) available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html last visited (Sept. 1, 2021).

[14] *Id.*

10

words, for every one million adults infected age 50 or younger, 999,500 of them will survive COVID-19.[15]

58. Assuming the data regarding COVID-19 infections is accurate, the CDC's numbers show Americans across the board are far more likely to die of something other than COVID-19.[16]

E. **Asymptomatic People Pose Little Risk of Transmitting the Virus**

59. Tyson already employs a very successful method of preventing COVID-19 spread from the symptomatic – self-quarantine. Tyson's vaccination mandate only addresses one risk: asymptomatic lethal spread. The problem with Tyson's approach is two-fold: first, asymptomatic lethal spread is less than a one-in-a-million risk at worst; and testing more effectively, and easily, suffices rather than forced injections of unwanted experimental, potentially life-altering drugs developed in ways that offend many Missourians' religious beliefs.

60. Tyson uses the specter of "asymptomatic spread" – the notion that fundamentally healthy people could transmit COVID-19 to others without having any symptoms of COVID-19 – to justify its vaccine mandate. But there is little credible scientific evidence that demonstrates the phenomenon of "asymptomatic spread" poses any meaningful danger to Tyson employees or anyone else, for that matter. Indeed, it is "very rare" even according to Anthony Fauci, and, at worst, poses a one-in-a-million risk of lethal spread. Tyson's response to COVID-19 is predicated in part

---

[15] *Id.*
[16] *See*, Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male, NATURE* (Aug. 28, 2020) [individuals under 50 face a negligible threat of a severe medical outcome from a coronavirus infection, akin to the types of risk that most people take in everyday life, such as driving a car].

11

on the flawed assumption that asymptomatic individuals pose a meaningful risk of spreading the disease.

61. Evidence of transmission requires that an individual can be shown to be the source of infection for another person who then developed symptoms of a disease/illness.

62. Basic microbiology shows that infectiousness or transmission of viruses such as COVID-19 require an active infection resulting in elevated levels of viral replication in the host and shedding of the virus.[17]

63. Decades of research demonstrates that symptomatic people, such as those coughing, sneezing, and wheezing, are the read drivers of viral spread, a fact Dr. Anthony Fauci initially acknowledged during the early days of the pandemic when he told the press, "[E]ven if there is some asymptomatic transmission, in all the history of respiratory-borne viruses of any type, asymptomatic transmission has never been the driver of outbreaks. *The driver is always a symptomatic person*"[18] (emphasis added).

64. When the viral replication process is blocked by a healthy immune system, the virus is neutralized, preventing significant viral replication and shedding. This occurs in approximately half the people exposed to the virus. Their immune system's defense effectively wards off COVID-19 before it can take hold and cause asymptomatic

---

[17] *See generally*, Samuel Baron, et. al., *Medical Microbiology* (4th ed. 1996) available at https://www.ncbi.nlm.nih.gov/books/NBK8149/ (last visited Sept. 27, 2021); *See also*, Hitoshi Kawasuji, et. al, *Transmissibility of COVID-19 depends on the viral load around onset in adult and symptomatic patients*, PLOS ONE (Dec. 9, 2020) available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0243597 (last visited Sept. 27, 2021).

[18] U.S. Department of Health and Human Services, *Update on the New Coronavirus Outbreak First Identified in Wuhan, China*, YouTube (Jan. 28, 2020) available at https://www.youtube.com/watch?v=w6koHkBCoNQ&t=2638s (last visited Sept. 27, 2021).

12

disease. Research demonstrates that asymptomatic people are not the driver of COVID-19 transmission as demonstrated in the following points.

65.　Researchers studying real-world laboratory samples of more than a quarter-million people found that even with a positive RT-PCR test, asymptomatic people have a much lower probability of being infectious.[19] According to a meta-analysis of contact tracing studies published in the *Journal of the American Medical Association,* at most, asymptomatic COVID-19 spread was only about 0.7%.

66.　A research article published in the CDC's *Emerging Infectious Diseases* journal notes that little to no transmission of COVID-19 occurred from asymptomatic people studied by researchers in Germany.[20] The researchers note, "The fact that *we did not detect any* laboratory-confirmed SARS-CoV-2 transmission from asymptomatic case-patients is in line with multiple studies…"[21] (emphasis added). The lack of scientific and medical evidence surrounding the asymptomatic spread led the researchers to conclude that asymptomatic spread is "unlikely to substantially spread COVID-19."[22]

67.　A review in March 2021 of all the published meta-analyses on asymptomatic transmission from Dr. John Lee, a retired British Professor of Pathology, reveals that in many cases, the same few studies have been recycled repeatedly to support the flawed proposition that those who are asymptomatic pose a real danger.[23] In the

---

[19] *The performance of SARS-CoV-2 RT-PCR test as a tool for detecting SARS-CoV-2 infection in the population*
[20] Jennifer K. Bender, *Analysis of Asymptomatic and Presymptomatic Transmission in SARS-CoV-2 Outbreak, Germany, 2020,* 27 Emerging Infectious Diseases 4 (April 2021) available at https://wwwnc.cdc.gov/eid/article/27/4/20-4576_article (last visited Sept. 27, 2021).
[21] *Id.*
[22] *Id.*
[23] See, John Lee, *Asymptomatic spread: who can really spread COVID-19,* Health Advisory & Recovery Team (March 2021) available at https://www.hartgroup.org/wp-content/uploads/2021/03/ASYMPTOMATIC-SPREAD.pdf, (last visited Aug. 28, 2021).

13

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

words of Allyson M. Pollock, a professor of public health at Newcastle University in the United Kingdom, "Searching for people who are asymptomatic yet infectious is like searching for needles that appear and reappear transiently in haystacks, particularly when rates are falling."[24]

68.    Moreover, according to the FDA, there is insufficient data to determine the vaccines authorized for emergency-use[25], actually prevent asymptomatic infection or the transmission of SARS-CoV-2, the virus that causes COVID-19.

69.    Recently, the CDC reported that "new scientific data" demonstrated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[26]

70.    Tyson's vaccine mandate "accommodation" – limiting asymptomatic unvaccinated employees from its workplace by effectively terminating them – flies in the face of the current scientific literature, which shows asymptomatic spread of COVID-19 is virtually non-existent.

71.    In sum, there is little objective evidence to support a finding that asymptomatic spread is a driver of COVID-19 and therefore, poses a danger to Tyson's workplaces. Rather, the epidemic spread of COVID-19 is propelled almost

---

[24] Allyson M. Pollock, *Asymptomatic transmission of covid-19, theBMJ* (Dec. 21, 2020) available at https://www.bmj.com/content/371/bmj.m4581 (last visited Sept. 27, 2021).
[25] The Pfizer and BioNTech BNT162b2 COVID-19 vaccine (hereafter, "the Pfizer vaccine"); the ModernaTX mRNA-1273 COVID-19 vaccine (hereafter, "the Moderna vaccine"); the Janssen Biotech, Inc. (Johnson & Johnson) Ad26.COV2.S COVID-19 vaccine (hereafter, "the Johnson & Johnson vaccine") (collectively, "COVID-19 vaccines").
[26] See CDC reversal on indoor masking prompts experts to ask, *"Where's the data?", WASHINGTON POST (July 28, 2021), available at wapo.st/2THpmIQ* (last visited Oct. 2, 2021).

14

exclusively by *symptomatic persons* (some of whom are fully vaccinated) who can easily self-isolate or quarantine from their co-workers.

72. A reasonable accommodation to vaccination is not to place perfectly healthy workers on unpaid status, and further to ban them from the workplace for up to a year, as Tyson now says it will do. Tyson's COVID-19 vaccination mandate is nonsensical, unjust, and a violation of Missouri law. A far more sensible policy is to require those experiencing symptoms consistent with COVID-19 to self-isolate or quarantine from the workplace.

**F.    Tyson's Vaccine Mandate Will Not Stop the Spread of COVID-19**

73. Recent Israeli data found that those who had received the BioNTech vaccine were 6.72 times more likely to suffer a subsequent infection than those with natural immunity.[27] Israeli data also indicates the protection BioNTech grants against infection is short-lived compared to natural immunity and degrades significantly faster. In fact, as of July 2021, vaccine recipients from January 2021 exhibited only 16% effectiveness against infection and 16% protection against symptomatic infection, increasing linearly until reaching a level of 75% for those vaccinated in April.[28]

74. Similarly, scientists studying over 4,000 frontline workers found that between December 2020 until April 2021, the effectiveness of the vaccines cratered from 91

---

[27] David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection?* Israel National News, (Jul. 13, 2021), available at https://www.israelnationalnews.com/News/News.aspx/309762 (last visited Aug. 26, 2021).
[28] Nathan Jeffay Israeli, *UK Data Offer Mixed Signals on Vaccine's Potency Against Delta Strain,* THE TIMES OF ISRAEL (July 22, 2021), available at bit.ly/3xg3uCg (last visited Aug. 26, 2021).

15

percent to 66 percent. This drastic decline occurred *before* the SARS-CoV-2 Delta variant became the predominant variant.[29]

75. Even more alarming, research focusing on the Pfizer vaccine's effectiveness in America shows that from December 14, 2020 until August 8, 2021, the vaccine plummeted in effectiveness, collapsing from 88 percent to 47 percent.[30]

76. Israel, the most aggressively vaccinated nation in the world, saw its COVID-19 cases dramatically rise to unprecedented levels while its neighbors saw no such increase, even as the country became more and more vaccinated.

77. A paper published in *Euro Surveillance*, a journal published by the European Centers for Disease Control, documents a significant outbreak of COVID-19 among fully vaccinated patients and staff at a hospital in Tel Aviv.[31] At the time of the outbreak, investigators determined 238 out of 248 of exposed patients and staff had been fully vaccinated with Pfizer's mRNA vaccine.[32] Ultimately, 39 out of the 238 exposed vaccinated people (16 percent) were infected, along with 3 out of 10 unvaccinated people – a difference that doesn't reach statistical significance because the unvaccinated group is too small.[33] Of the infected, 23 were patients and 19 staff.[34] The staff all recovered quickly, but five patients died and another nine

---

[29] Ashley Fowlkes, et. al., *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance – Eight U.S. Locations, December 2020 – August 2021*, 70 Morbidity and Morality Weekly Report, (Aug. 27, 2021) available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.htm (last visited Sept. 27, 2021).

[30] Sara Y. Tartof, et. al., *Six-month effectiveness of BNT162b2 mRNA COVID-19 vaccine in a large US integrated health system: a retrospective cohort study,* MedRxiv (July 28, 2021) available at https://www.medrxiv.org/content/10.1101/2021.07.28.21261159v1 (last visited Aug. 26, 2021).

[31] Pinina Shitrit, et. al., *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021,* (July 2021) available at https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2021.26.39.2100822#html_fulltext (last visited on Oct. 3, 2021).

[32] *Id.*

[33] *Id.*

[34] *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021.*

16

had severe or critical cases.[35] *All were vaccinated.*[36] On the other hand, the two unvaccinated infected patients both had only *mild* cases of COVID-19.[37]

78.     The fact that 96 percent of the people in the Tel Aviv hospital population had been vaccinated – a level far above early estimates of the percentages required for herd immunity – apparently made no difference in stopping the spread of COVID-19.[38] As the authors explained: "This communication...challenges the assumption that high universal vaccination rates will lead to herd immunity and prevent COVID-19 outbreaks..."[39]

79.     The crumbling effectiveness of the vaccines should come as little surprise as currently all available COVID-19 "vaccines" do not function the way vaccines are expected to work by the public. As currently understood, the main benefit the available vaccines may confer is a reduction of serious clinical disease, thus, lessening a person's symptoms from COVID-19, but not stopping infection or preventing vaccinated persons from spreading the virus.

G.     **Natural Immunity is Durable, Lasting, and Superior to Vaccination**

80.     There is strong evidence that persons who have been infected with SARS-CoV-2 and recovered are protected from future reinfection for over a year, and potentially have lifelong immunity – unlike vaccinated persons for whom boosters are already being recommended and administered.[40] It is therefore a true medical mystery why Tyson wholesale disregard the relevance of natural immunity entirely.

---

[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021.*
[39] *Id.*
[40] *See,* Yair Goldberg; Micha Mandel, et. al., *Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2 vaccine protection: A three month nationwide experience from Israel,* medRxiv (April 20, 2021) available

17

81. Natural immunity includes antibodies, B-cells, plasma cells, T-helper cells, T-presenting cells, natural killer cells, and a host of innate defenses against the virus. Natural immunity is robust, durable, and complete against all variations of SARS-CoV-2.

82. A bevy of epidemiological studies demonstrate to a reasonable degree of medical certainty that natural immunity following infection and recovery from the SARS-CoV-2 virus provides robust and durable protection against reinfection, at levels equal to or better than the most effective vaccines currently available.[41]

83. For example, a recent analysis of an outbreak among a small group of mine workers in French Guinea found that 60 percent of fully vaccinated miners suffered breakthrough infections compared to zero among those with natural immunity.[42]

84. Likewise, Scientists from the University of California, San Diego who assessed multiple mechanisms of adaptive immunity (e.g. CD4+ T cell, CD8+ T cell, and humoral immunity) demonstrated that immunity for COVID-19 following infection is likely durable.[43]

85. What is more, Israeli researchers conducting a massive group study found exceedingly low reinfection rates for people previously infected with COVID-19,

at https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1 (last visited on Aug. 26, 2021); *See, also* Jackson S. Turner, Wooseob Kim, et. al., *SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans*, Nature 595 (pp. 421-425) (May 24, 2021).

[41] *See, e.g.* N. Kojima; A. Roshani, et. al., *Incidents of Severe Acute Respiratory Syndrome Coronavirus-2 Infection among previously infected or vaccinated employees*, medRxiv (July 3, 2021) available at https://www.medrxiv.org/content/10.1101/2021.07.03.21259976v2 (last visited on Aug. 26, 2021).

[42] Nicholas Vignier, et. al., *Breakthrough Infections of SARS-Co V-2 Gamma Variant in Fully Vaccinated Gold Miners, French Guinea, 2021*, 27(10) EMERG. INFECT. DIS. (Oct. 2021), *available at* bit.ly/2Vmjx43 (last visited on Oct. 2, 2021).

[43] Jennifer M. Dan, et. al., *Immunological memory to SARS-CoV-2 assessed for up to 8 months after infection*, National Center for Biotechnology Information (Jan. 6, 2021) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7919858/ (last visited Oct. 3, 2021).

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

too.[44] More interestingly, the Israeli scientists found people who receive both doses of the EUA-approved Pfizer shot were up to *13 times more likely to contract the virus than those who were previously infected with the virus*.[45]

86.    Studying more than 800,000 people split into three groups, the Israel team concluded:[46]

> "This study demonstrated that *natural immunity confers longer lasting and stronger protection against infection,* symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2, compared to the BNT162b2 two-dose vaccine-induced immunity." (emphasis added).

87.    The above findings are particularly important because the Delta variant accounted for nearly all coronavirus infections in Israel by the summer of 2021 thus, conclusive evidence that natural immunity *remained protective against Delta.*

88.    Consistent with the Israeli research team's findings, the Cleveland Clinic found similar data supporting the strong durability of natural immunity. In June of 2021, the Cleveland Clinic released a study of 1,359 previously infected health care workers. Researchers found a reinfection rate of *zero*, despite some of the studied individuals having been around COVID-positive patients more than the regular population.[47] Not one of the 1,359 previously infected subjects who remained unvaccinated, had a SARS-CoV-2 infection over the duration of the Cleveland Clinic study.[48]

---

[44] *See*, Svian Gazit, et. al., *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfection versus breakthrough infections*, medRxiv, https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf (last visited on Aug. 26, 2021).
[45] *Id.*
[46] *Id.*
[47] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).
[48] *Id.*

19

89. The Cleveland Clinic researchers concluded: "*Individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination*, and vaccines can be safely prioritized to those who have not been infected before." (emphasis added).[49]

90. Similarly, researchers studying patients in Seattle and Atlanta found that most recovered COVID-19 patients produced durable antibodies, memory B cells, and durable polyfunctional CD4 and CD8 T cells, which target multiple parts of the virus.[50] "Taken together, these results suggest that broad and effective immunity may persist long-term in recovered COVID-19 patients," concluded the authors. Thus, unlike with the vaccines, no boosters are required to assist natural immunity.

91. Moreover, Researchers in California conclude: "Natural infection induced expansion of larger CD8 T cell clones occupied distinct clusters, likely due to the *recognition of a broader set of viral epitopes* presented by the virus *not seen in the mRNA vaccine*" (emphasis added).[51]

92. Further, in June of 2021, Rockefeller University researchers published a paper in *Nature* examining how antibodies changed up to a year after coronavirus infection and recovery.[52] The authors report: "B cell clones expressing broad and potent antibodies are selectively retained in the repertoire over time and expand markedly

---

[49] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).
[50] Kristen W. Cohen, et. al., *Longitudinal analysis shows durable and broad immune memory after SARS-CoV-2 infection with persisting antibody responses and memory B and T cells*, Cell Reports Medicine (July 20, 2021).
[51] Suhas Sureschandra, et. al., *Single cell profiling of T and B cell repertoires following SARS-CoV-2 mRNA vaccine*, bioRxvi, (July 15, 2021).
[52] Zijun Wang, et. al., *Naturally enhancing neutralizing breath against SARS-CoV-2 one year after infection*, Nature, (June 14, 2021) available at https://www.nature.com/articles/s41586-021-03696-9, (last visited August 26, 2021).

20

after vaccination. The data suggest that immunity in convalescent individuals will be very long lasting."[53]

93. Aside from more robust T cell and memory B cell immunity, which is likely more important than antibody levels, another team of Israeli researchers found that antibodies wane slower among those with prior infection. In vaccinated subjects, antibody titers decreased by up to 40% each subsequent month while in convalescents they decreased by less than 5% per month.[54]

94. Given the mounting body of compelling research, it is medically unnecessary for persons who have recovered from COVID-19 and present evidence of natural immunity, to undergo vaccination for SARS-CoV-2.

95. Therefore, forcing immune Plaintiff to receive the COVID-19 vaccine would not only offer him or those around him little benefit, but it would also subject him to an elevated risk of adverse side effects, including death, as demonstrated below.

**H.    Defendant Failed to Properly Consider the Known and Potential Risks of the Vaccine**

96. The government operated VAERS database is intended to function as an "early warning" system for potential health risks caused by vaccines. Presently, VAERS is broadcasting a red alert, but Tyson refuses to heed the warning and instead is barreling down the tracks of forced vaccination at full steam.

---

[53] *Id.*
[54] Ariel Israel, et. al., *Large-scale study of antibody titer decay following BNT162b2 mRNA vaccine or SARS-CoV-2 infection*, medRxiv, (August 22, 2021).

21

97.    Recent data presents an alarming picture: As of early September, there have been 14,506 deaths reported to VAERS from COVID-19 vaccines[55], compared to just 8,673 for the preceding 30 years for all other vaccines.[56]

98.    According to Josh Guetzhow, Ph.D, there are *91 times* the number of deaths and *276 times* the number of coagulopathy events reported after COVID-19 vaccination than after flu vaccination.[57]

### Number of Deaths Reported to VAERS Since 1990



99.    Moreover, new research suggests the heightened risk of adverse effects results from "preexisting immunity to SARSCov-2 [that] may trigger unexpectedly intense, albeit relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals."[58]

---

[55] Josh Guetzhow, Safety Signals for COVID Vaccines Are Loud and Clear. Why Is Nobody Listening?, THE DEFENDER, (Sept. 29, 2021) available at https://childrenshealthdefense.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/ (last visited Oct. 2, 2021).
[56] Id.
[57] Id.
[58] Angeli et. al., *SARS-CoV-2 Vaccines: Light and Shadows*, 88 EUR. J. INTERNAL MED. 1, 8 (2021).

22

100. Although the number of VAERS reports is alarming in its own right, it is likely the true number of adverse effects associated with the COVID-19 vaccines far exceeds cases reported to VAERS.

101. In 2010, a federal study commissioned by the U.S. Health and Human Services and performed by Harvard consultants on behalf of the Agency for Healthcare Research and Quality (AHRQ) found that "fewer than 1% of vaccine adverse events" are ever reported to VAERS.[59] Thus, it is likely scores of adverse events associated with the COVID-19 vaccines, including deaths, are going unreported.

102. But it is just not VAERS that is broadcasting a red alert. On October 1, 2021, the European Union's drug regulator, The European Medicines Agency ("EMA"), identified a new possible link between rare cases of blood clotting in deep veins with Johnson & Johnson's COVID-19 vaccine.[60] The EMA said the new, possibly life-threatening clotting condition known as venous thromboembolism (VTE) should be included on the Johnson & Johnson product label as a possible side-effect of the shot.[61]

103. What is more, the Moderna and Pfizer Vaccines are made with polyethylene glycol ("PEG"). PEG has been linked to anaphylaxis in numerous recipients of the vaccine. PEG is the delivery mechanism to the cells which keeps the MRNA from dispersing and not reaching its intended target. PEG performs its intended use.

---

[59] Lazarus, Ross, MMBS, et. al., *Electronic Support for Public Health-Vaccine Adverse Event Reporting System (ESP:VAERS)*, Agency for Healthcare Research and Quality (Sept. 30, 2010) available at https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf (last visited Oct. 2, 2021).

[60] Reuters, EU finds J&J COVID shot possibly linked to another rare clotting condition, REUTERS (Oct. 1, 2021) available at https://www.reuters.com/business/healthcare-pharaceuticals/eu-finds-jj-covid-shot-possibly-linked-another-rare-clotting-condition-2021-10-01/ (last visited Oct 2, 2021).

[61] *Id.*

23

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

Unfortunately, about 70% of the U.S. Population is slightly to somewhat allergic to PEG. Despite that most of the United States is only mildly allergic to PEG, approximately 7% of the U.S. Population is highly allergic to PEG.

104. The National Institute of Health ("NIH") recently began a clinical trial of "systemic allergic reaction to the Moderna or Pfizer-BioNTech COVID-19 vaccines" due to recipients of those vaccines experiencing anaphylaxis."[62]

105. It has also been reported that "The Pfizer/BioNTech COVID-19 vaccines can cause severe anaphylaxis" tied to the PEG used.[63]

106. Despite the very well-known anaphylaxis risks associated with the COVID-19 vaccines, Tyson is not offering PEG allergy testing as part of its vaccine mandate.

107. Moreover, Tyson is not offering any indemnity or disability coverage from any of the known and potential adverse effects of the COVID-19 vaccines.

108. To summarize, the potential adverse effects Plaintiff faces in being coerced to receive the COVID-19 vaccines pursuant to Tyson's mandate are not theoretical, hypothetical, or academic – they are very real and have real victims. Given the alarming reports of adverse side-effects associated with the COVID-19 vaccines, subjecting Plaintiff to vaccination exposes him to a variety of health risks ranging from headaches to blood clots to death.

I. **Tyson Exaggerates the Specter of the Virus to Justify the Vaccine Mandate**

109. Tyson maintains several facilities across Missouri, including sites in Barry County.

---

[62] *See* https://www.nih.gov/news-events/news-releases/nih-begins-study-allergic-reactions-moderna-pfizer-biontech-covid-19-vaccines
[63] *See* https://onlinelibrary.wiley.com/doi/10.1111/cea.13874.

24

110. Tyson's Chief Medical Officer, Dr. Claudia Coplein, appealed to fear, not science, when she publicly opined that forced vaccination was the "single most effective" thing Tyson could do because unvaccinated people were causing rising case counts.[64]

111. But data from Missouri Department of Health ("MDH") does not support Dr. Coplein's hyperbolic remarks. MDH reports 3,070 cases of COVID-19 in Barry County since March of 2020.[65] As of October 17, 2021, MDH reports 2,983 of the 3,070 cases of COVID-19 are considered either "inactive" or "recovered."[66] This is true even though only 45.4% of the county is fully vaccinated.[67] Thus far, only 60 deaths caused or associated with COVID-19 have been reported in Barry County since the advent of the virus nearly two years ago.[68]

112. Similarly, in Lawrence County, MHD's COVID Dashboard shows 4,016 cases of COVID-19 have been reported since March of 2020.[69] Like in Barry County, the vast majority of the reported cases in Lawrence County show either "inactive" or "recovered." This is despite the fact that only 36.75% of the county is fully vaccinated.[70] Data for Lawrence County shows only 104 deaths as a result of COVID-19 since March of 2020.

---

[64] Tyson Foods, *Tyson Foods to Require COVID-19 Vaccinations for its U.S. Workforce* (Aug. 3, 2021) available at https://www.tysonfoods.com/news/news-releases/2021/8/tyson-foods-require-covid-19-vaccinations-its-us-workforce (last visited Sept. 27, 2021).
[65] Missouri Department of Health, *COVID-19 Data for: Barry County* (Oct. 17, 2021) available at https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/county.php
[66] *Id.*
[67] *See* https://covidactnow.org/us/missouri-mo/county/barry_county/?s=24351349 (last visited Oct. 17, 2021).
[68] *See* https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/county.php (last visited Oct. 17, 2021).
[69] *See* https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/county.php.
[70] *See* https://data.news-leader.com/covid-19-vaccine-tracker/missouri/lawrence-county/29109/ (last visited Oct. 17, 2021).

25

113.    What is more, in Christian County, MDH reports 10,319 cases of COVID-19 since approximate March of 2020.[71] Currently, 10,109 of those cases are considered "inactive" or "recovered" even though only 43.5% of the county is fully vaccinated.[72] Like the other two counties, data for Christian County shows most people do not die from COVID-19 with only 157 deaths being reported since March of 2020.

114.    Thus, MDH's data shows that even in counties with low vaccination rates, the overwhelming majority of people do not die from COVID-19, nor end up even being hospitalized. Yet, Tyson grossly exaggerates the specter of the virus, appealing to fear, not rationality, in a failed attempt to justify its unlawful mandate on its employees.

**J.    Missouri law forbids discrimination and retaliation**

115.    Missouri's anti-discrimination laws (Missouri Human Rights Commission Act) mirror Title VII of the federal Civil Rights Act Section 213.055 RSMo.

116.    Missouri's anti-discrimination statutes forbid Tyson from discriminating and retaliating against employees based on their religious beliefs or medical conditions.

117.    The Missouri Human Rights Commission Act ("MHRCA") makes it illegal to discriminate in any aspect of employment because of an individual's race, color, religion, national origin, ancestry, sex, disability, or age. Specifically, under the MHRCA, an employer may not discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement,

---

[71] *See* https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/county.php
[72] *See https://data.news-leader.com/covid-19-vaccine-tracker/missouri/lawrence-county/29109/*

26

or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

118.   Likewise, the Missouri Human Rights Commission Act ("MHRCA") forbids and employer from engaging in a discriminatory practice with respect to the compensation, terms, conditions, privileges or employment because of an individual's race, creed, color, religion, sex, age, or national origin. See *Blackwell v. DaimlerChrystler Corp.*, 399 F. Supp. 2d 998 (E.D.Mo. 2005); *Hurst v. Kan. City, Mo. Sch. Dist.*, 437 S.W.3d 327 (Mo. App. 244); 328 S.W.3d 777 (Mo. App. 2010); *Baker v. Silver Oak Senior Living Mgmt. Co., L.C.*, 581 F.3d 684 (*th Cir. 2009).

119.   The MHRCA is a "comprehensive anti-discrimination statute," enacted to [s]afeguard all individuals within the state from discrimination because of race, creed, color, religion, sex, age, or national origin in connection with employment."

120.   The MHRCA provides that it is a discriminatory practice to "retaliate against an individual for filing a complaint of discrimination, participating in an investigation or hearing, or opposing discriminatory practices."

121.   Under the MHRCA any person who believes that they have been discriminated against by an employer may file a complaint of discrimination.

122.   The state purpose and intent of the MHRCA is to provide for execution within Missouri of the policies embodied in the federal rights laws.

123.   Ultimately, a claim brought under the MHRCA is analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964. *Tero v. Elliot Popham Pontiac, Oldsmobile, Buck & GMC Trucks, Inc.*, 173 F.3d 988, 933 (6th

27

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

Cir. 1999); *State ex rel. Diehl v. O'Malley*, 95 S.W.3d 82 (Mo. banc. 2003); *Daugherty v. City of Md. Heights*, 231 S.W.3d 814 (Mo. banc 2007); *Watson v. CEVA Logistics U.S., Inc.* 619 F.3d 936 (8th Cir. 2010); *Shirrell v. St. Francis Med. Ctr.*, 24 F. Supp. 3d 851 (E.D. MO 2014); and *Wallace v. DTG Operations, Inc.*, 563 F.3d 357. Generally, we interpret the MHRCA similarly, if not identically, to Title VII, but we are not obligated to follow and we are not limited by federal law when interpreting the MHRCA.

124.    Consequently, in construing and applying the MHRCA, decisions of federal courts addressing similar issues under Title VII (Americans with Disabilities Act) are helpful and potentially persuasive authority.

**K.    Tyson's Accommodation Request System**

125.    Tyson required employees to fill out an official form and turn it into the HR department for religious exemptions.

126.    Tyson has also allowed for a religious accommodation letter to be sent to the HR department.

127.    Tyson offered those who applied for an accommodation up to one year of unpaid leave of absence or until they received the vaccine. (A true and correct copy of Tyson's *"Explanation of Leave + Accommodation"* policy, is attached as "Exhibit B" and incorporated herein by reference; a true and correct copy of Tyson's letter to employees who request a medical or religious accommodation dated September 17, 2021, is attached as "Exhibit C" and incorporated herein by reference). There were informed that after one year they would be effectively terminated from their

28

position at Tyson. *Id.* Tyson employees were also informed that even if they did receive the vaccine their positions would not be guaranteed. *Id.*

128. In response to Plaintiff's religious accommodation request, his superiors told him that the request had been accepted.

129. Tyson has stated to Plaintiff that he must accept the accommodation as quickly as possible and if not accepted then on November 1, 2021, Tyson will be sending out separation letters. Tyson's HR department has stated that they need an answer by October 18 as to the acceptance of the accommodation. A true and correct copy of this email chain is attached hereto as "Exhibit D" and incorporated herein by reference.

130. Tyson's HR has stated that this accommodation may not even be available by November 1 as a way to pressure and coerce their employees to either take the vaccine or make a decision as quickly as possible.

**L.    COVID Vaccines Violate Plaintiff's Religious Beliefs**

131. Presently, all COVID-19 vaccines have been made use either in production or testing of fetal cell lines developed from tissues originally derived from aborted fetuses (see excerpt below).[73]



---

[73]   *See,* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines,* http://publichealth.lacounty.gov/media/Coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf (last accessed August 26, 2021).

29

132.    For example, the Johnson & Johnson vaccine used fetal cell cultures, specifically PER.C6, a retinal cell line that was isolated from a terminated fetus in 1985.[74]

133.    In an interview with WREG, Dr. Steve Threlkeld, president of the medical staff at Baptist Hospital in Memphis, Tennessee acknowledged fetal cell lines used to produce or test the Johnson & Johnson COVID-19 vaccines "were actually recovered from an aborted fetus in the 70s or 80s and there are several of these cell lines."[75]

134.    As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293 was used during the research and development phase.[76] All HEK 293 cells are descended from tissue taken in 1973 from either an elective abortion or miscarriage[77] that took place in the Netherlands.[78]

135.    While the production of the vaccines did not reportedly require any new abortions, Plaintiff objects to receiving the COVID-19 vaccines on the basis that, even assuming the vaccines do confer a meaningful health benefit, that benefit is one from ill-gotten gains.

---

[74] *Are the vaccines made with fetal cells,* Institute for Clinical Systems Improvement, https://www.icsi.org/covid-19-vaccine-faq/are-the-mma-vaccines-made-with-fetal-cells/ (last accessed August 26, 2021), see also, Tennessee Department of Health, *Fact v. Fiction: Johnson & Johnson Vaccine* (2021) available at https://covid19.tn.gov/stay-informed/blogs/fact-v-fiction-johnson-johnson-vaccine/ (last visited Sept. 27, 2021) (acknowledging the Johnson & Johnson vaccine was developed from a fetal cell line).

[75] WREG, *State: Fetal cell lines, not fetal tissue, were used to make Johnson & Johnson vaccine* (March 5, 2021) available at https://www.wreg.com/news/state-fetal-cell-lines-not-fetal-tissue-was-used-to-make-johnson-johnson-vaccine/ (last visited Sept. 27, 2021).
[76] *See,* Nebraska Medicine, *You asked, we answered: Do the COVID-19 vaccines contain aborted fetal cells?* https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells (last visited on Aug. 26, 2021).
[77] *COVID-19 Vaccine and Fetal Cell Lines.*
[78] *Id.*

30

136.    Plaintiff believes any benefit the COVID-19 vaccines may confer, flows from the unjust exploitation of unborn human life. On this basis alone, Plaintiff refuses on religious grounds to accept or be forced to accept the COVID-19 vaccines.

**M.    Employers Who Have Failed to Provide Reasonable Accommodations for Vaccine Mandates Have Been Held Liable**

137.    The discouragement or denial of religious accommodations from employers' mandatory vaccine policies has been found unlawful, even when those mandates were proscribed by hospitals. Indeed, numerous employers have been sued and lost over forced vaccines. *See e.g. EEOC v. Mission Hosp. Inc.*, No. 1:16-cv-118-MOC-DL, 2017 WL 3392783 (W.D.N.C. Aug. 2017) [resulting in permanent injunction against the employer from improperly denying religious exemptions from mandated vaccines and requiring employer to pay $89,000 in damages]; *United States v. Ozaukee County,* No. 18-cv-343-pp (E.D. Wis. 2018) [resulting in a permanent injunction against the employer for failure to grant religious exemptions from compulsory vaccines and order payment of damages to employee].

138.    Likewise, in *EEOC v. Saint Vincent Health Center*, Civil Action No. 1:16-cv-234 (2016), the employer agreed to pay $300,000 to a class of six aggrieved former employees and provided substantial injunctive relief to settle a religious discrimination lawsuit based upon a failure to grant a religious exemption as part of a mandatory seasonal flu vaccination requirement for its employees.

139.    Moreover, in *EEOC v. Memorial Healthcare*, Civil Action No. 2:18-cv-10523 (2018), the defendant employer paid $74,418 ($34,418 in back pay, $20,000 in compensatory damages and $20,000 in punitive damages) for refusing to hire a

31

medical transcriptionist because of her religious beliefs against receiving flu shots and refusing to accommodate those beliefs.

140. In fact, as recently as 2018, the U.S. Equal Employment Opportunity Commission sued Nashville-based Saint Thomas Health, after the employer failed to make a reasonable religious accommodation for the flu vaccine. *EEOC v. Saint Thomas Health*, Civil Action No. 3:18-cv-00978 (M.D. Tenn. 2018).

141. The *Saint Thomas Health* case resulted in consent decree enjoining the employer from failing to provide religious accommodations to an employee's sincerely held religious beliefs unless such requests created an undue hardship. The decree also awarded the injured employee $75,000 in damages and directed the employer to issue the employee an apology letter.

## COUNT I: DEFENDANT'S VIOLATION OF PUBLIC POLICY

COMES NOW, Plaintiff and for Count I states as follows:

142. Plaintiff reincorporates by reference each and every allegation contained in paragraphs 1 through 141.

143. On or about September 26, 2021, Plaintiff filed a complaint with the Missouri Commission on Human Rights (MCHR).

144. Due to Defendant's actions, the investigation will not be completed within 180 days or before November 1, 2021. Defendant knew the forced vaccination policy of August 2021 that no proper investigation could be completed by the Missouri Human Rights Commission to prevent Defendant's religious discrimination.

32

145. That on or about October 23, 2021, Plaintiff's position, which Defendant had posted because of Plaintiff's religious beliefs and exemption to the COVID vaccination, is being filled.

146. The Defendant has demoted or changed Plaintiff's employment with the Defendant due to Plaintiff's religious beliefs and filing a complaint with MCHR.

147. Under the law, Plaintiff is allowed to file complaints with the State and Federal agencies without being penalized by his employer, the Defendant.

148. Because Plaintiff has filed his complaint and exercised his Constitutional rights, the Defendant has and will improperly harm the Plaintiff in changing or threatening to change his position.

149. As a direct result of Defendant's wrongful action, Plaintiff will suffer lost wages, lost bonus, loss in health coverage for himself and his family, loss of benefits, and physical, emotional, and mental anguish as injuries.

150. Defendant's conduct as described herein is intentional, willing, knowing, malicious and outrageous and warrant an award of punitive damages in the sum not less than $100,000.00.

**WHEREFORE**, Plaintiff respectfully prays for the following relief in Count I:

a. For declaratory relief that Defendant Tyson violated the Missouri law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

b. For declaratory relief that Defendant Tyson violated the law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

33

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

c. For injunctive relief enjoining Defendant Tyson, its officers, agents, servants, employees, attorneys, successors, and all persons in active concert or participation with it, from discriminating against Plaintiff by refusing to grant reasonable religious or health accommodations to its COVID-19 vaccination mandate;

d. For damage caused to Plaintiff by Defendant's actions described herein;

e. For punitive damage in excess of $100,000.00;

f. Award Plaintiff's attorneys' fees and costs of suit; and

g. Grant any such further relief as the Court deems necessary and proper in the public interest.

## COUNT II: DEFENDANT'S ASSAULT

151. Plaintiff hereby incorporates by reference the allegations contained in the paragraphs 1-150 as if fully set forth herein.

152. Under Missouri law, a person commits assault who "intentionally or knowingly causes another to reasonably fear imminent bodily injury."

153. Tyson has threatened intentional harmful and offensive contact upon Plaintiff, by way of imposing the COVID-19 vaccine mandate upon him, under penalty of being terminated from his employment.

154. Tyson's COVID-19 vaccine mandate caused Plaintiff to reasonably believe that Tyson was about to carry out the threat of harmful and offensive contact upon him, by way of forcing Plaintiff to inject and untested and potentially unsafe substance into his body.

155. Plaintiff did not consent to Tyson's conduct and does not consent to receiving the COVID-19 vaccine.

34

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

156. Tyson's COVID-19 vaccine mandate has and continues to cause Plaintiff harm, including but not limited to by way of fear, anxiety, fright over being threatened, with the injection of an untested and potentially unsafe substance into the body, and the imminent loss of their income and livelihoods.

157. Tyson's conduct alleged herein was a substantial factor in causing Plaintiffs' harm.

**WHEREFORE**, Plaintiff respectfully prays for the following relief in Count II:

a. For declaratory relief that Defendant Tyson violated the Missouri law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

b. For declaratory relief that Defendant Tyson violated the law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

c. For injunctive relief enjoining Defendant Tyson, its officers, agents, servants, employees, attorneys, successors, and all persons in active concert or participation with it, from discriminating against Plaintiff by refusing to grant reasonable religious or health accommodations to its COVID-19 vaccination mandate;

d. For damage caused to Plaintiff by Defendant's actions described herein;

e. For punitive damage in excess of $100,000.00;

f. Award Plaintiff's attorneys' fees and costs of suit; and

g. Grant any such further relief as the Court deems necessary and proper in the public interest.

35

## COUNT III: DEFENDANT'S BREACH OF CONTRACT

158. Plaintiff hereby incorporates by reference the allegations contained in the paragraphs 1 through 157 as if fully set forth herein.

159. Plaintiff has fully performed the legal requirements for his employment with the Defendant.

160. Defendant has breached the employment contract with the Plaintiff in one or more of the following:

   a) Requiring Plaintiff to violate his deeply held religious belief on abortion in forcing the COVID vaccination mandate;

   b) Penalizing the Plaintiff for exercising his legal religious exemption to the COVID vaccination from unborn aborted babies;

   c) Changing Plaintiff's employment status with Defendant and depriving Plaintiff of earned salary, bonus, and benefits;

   d) Disclosing Plaintiff's private confidential medical information to unauthorized third parties; and

   e) Harassing and shaming the Plaintiff for his religious beliefs.

161. As a direct result of Defendant's breach of contract, Plaintiff sustained damage of loss wages, loss in bonus, loss in benefits, forced unpaid leave, and mental and physical anguish.

   **WHEREFORE**, Plaintiff respectfully prays for the following relief in Count III:

   a. For declaratory relief that Defendant Tyson violated the Missouri law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

36

b. For declaratory relief that Defendant Tyson violated the law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

c. For injunctive relief enjoining Defendant Tyson, its officers, agents, servants, employees, attorneys, successors, and all persons in active concert or participation with it, from discriminating against Plaintiff by refusing to grant reasonable religious or health accommodations to its COVID-19 vaccination mandate;

d. For damage caused to Plaintiff by Defendant's actions described herein;

e. For punitive damage in excess of $100,000.00;

f. Award Plaintiff's attorneys' fees and costs of suit; and

g. Grant any such further relief as the Court deems necessary and proper in the public interest.

## COUNT IV – DEFENDANT'S INVASION OF PLAINTIFF'S PRIVACY

162. Plaintiff hereby incorporates by reference the allegations contained in the paragraphs 1 through 161 as if fully set forth herein.

163. On or about September 7, 2021, Defendant shared to unauthorized persons Plaintiff's private and confidential medical information regarding the COVID vaccination.

164. This disclosure of the private and confidential information was not authorized by the Plaintiff.

37

165. As a direct result of the Defendant's disclosures, Defendant has made additional disclosures concerning the Plaintiff including the posting of his current position with the Defendant because he did not take the Covid vaccination.

166. As a direct result of Defendant's improper disclosure of private and confidential medical information, Plaintiff has sustained mental anguish, harassment, embarrassment as well as will experience loss of wages, income, and benefits.

**WHEREFORE**, Plaintiff respectfully prays for the following relief in Count IV:

    a. For declaratory relief that Defendant Tyson violated the Missouri law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

    b. For declaratory relief that Defendant Tyson violated the law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

    c. For injunctive relief enjoining Defendant Tyson, its officers, agents, servants, employees, attorneys, successors, and all persons in active concert or participation with it, from discriminating against Plaintiff by refusing to grant reasonable religious or health accommodations to its COVID-19 vaccination mandate;

    d. For damage caused to Plaintiff by Defendant's actions described herein;

    e. For punitive damage in excess of $100,000.00;

    f. Award Plaintiff's attorneys' fees and costs of suit; and

    g. Grant any such further relief as the Court deems necessary and proper in the public interest.

38

**COUNT V: IN THE ALTERNATIVE TO COUNT I, DEFENDANT'S VIOLATION OF THE MISSOURI HUMAN RIGHTS COMMISSION ACT RELIGIOUS DISCRIMINATION**

167.    Plaintiff hereby incorporates by reference the allegations contained in the paragraphs 1 through 166 as if fully set forth herein.

168.    Missouri Code of the Missouri Human Rights Commission Act ("MHRCA") states that "it is a discriminatory practice for an employer to ... discharge any person or otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's ... religion, ...; or limit, segregate or classify an employee or applicants for employment in any way that would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect the status of an employee, because of ... religion."

169.    "Any employee terminated in violation of this section may bring a civil action against the employee's employer." Missouri Human Rights Commission Act.

170.    Ultimately, a claim brought under the MHRCA is analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964. *Tero v. Elliot Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc.*, 173 F.3d 988, 933 (6th Cir. 1999); *State ex rel. Diehl v. O'Malley*, 95 S.W.3d 82 (Mo. banc. 2003); *Daugherty v. City of Md. Heights*, 231 S.W.3d 814 (Mo. banc 2007); *Watson v. CEVA Logistics U.S., Inc.* 619 F.3d 936 (8th Cir. 2010); *Shirrell v. St. Francis Med. Ctr.*, 24 F. Supp. 3d 851 (E.D. MO 2014); and *Wallace v. DTG Operations, Inc.*, 563 F.3d 357.

39

171. The Missouri Supreme Court has characterized this section of the Missouri Constitution as practically synonymous with the clauses of the first Amendment of the United States Constitution.

172. Our constitutions place the freedom of belief beyond government control or interference so that the freedom to believe is absolute and inviolate. *Medicine Bird*, 63 S.W.3d at 762 It [also] includes the right to act, or to refrain from acting, in a manner inconsistent with one's religious beliefs. *Id.* While "the freedom to act is subject to reasonable control for the protection of others," here Plaintiff's failure to act, in the form of refusing to receive a COVID-19 vaccine, on religious grounds, is protected by the Missouri Constitution.

173. The analysis of a religious accommodation claim begins with whether an employee has established a prima facie case of religious discrimination. *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007) [quoting *Smith v. Pyro Minning Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987)]. *Tero v. Elliot Popham Pontiac, Oldsmobile, Buck & GMC Trucks, Inc.*, 173 F.3d 988, 933 (6th Cir. 1999); *State ex rel. Diehl v. O'Malley*, 95 S.W.3d 82 (Mo. banc. 2003); *Daugherty v. City of Md. Heights*, 231 S.W.3d 814 (Mo. banc 2007); *Watson v. CEVA Logistics U.S., Inc.* 619 F.3d 936 (8th Cir. 2010); *Shirrell v. St. Francis Med. Ctr.*, 24 F. Supp. 3d 851 (E.D. MO 2014); and *Wallace v. DTG Operations, Inc.*, 563 F.3d 357.

174. To prevail on a claim of religious discrimination under the MHRCA, a plaintiff must present either direct evidence of discrimination or make a prima facie case of indirect discrimination. *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007) ("*Tepper*"). Where the discrimination claim is based on circumstantial evidence, a

40

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

burden-shifting framework is used, as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). This framework generally requires the following elements relating to the plaintiff: "(1) is a member of a protected group; (2) was subjected to an adverse employment action; (3) was qualified for the position; and (4) was treated less favorably than similarly-situate nonprotected employees." *Id.* "If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to offer evidence of legitimate, nondiscriminatory reason for its adverse action." *Tepper, supra,* 505 F.3d at 515.

175.    The MHRCA states that an "employer" cannot discriminate on the basis of religion, defining an employer as "the state, any political or civil subdivision thereof, and persons employing eight (8) or more persons within the state, or any person acting as an agent of an employer, directly or indirectly."

176.    The statutory definition imposes upon an employer the duty to make reasonable accommodations for religious observances short of incurring an undue hardship. *Reed v. UAW,* 569 F.3d 576, 579 (6th Cir. 2009) [citing *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 75 (1977)].

177.    The State of Missouri has expressly committed to the principle of fair and equal employment opportunities for its citizens, regarding religious accommodations, defining a protected religious practice or belief as follows "Religious beliefs are not only those beliefs held by traditional, organized religions, but also include moral or ethical beliefs as to what is right or wrong which are sincerely held with the strength of traditional religious views."[79]

---

[79] *See,* Religious Accommodation Guidelines, available at
https://www.tn.gov/content/dam/tn/hr/documents/Religion_Accommodation_Guidelines.pdf

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

178.  Plaintiff holds sincere religious beliefs that precludes him from receiving a COVID-19 vaccine. While there may be some who consider COVID-19 vaccines to be acceptable, no employer in Missouri, public or private, is permitted to decide for itself whose religious beliefs are valid, and whose are not.

179.  As the Supreme Court has recognized, an employee's "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Red. Bd. Of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981); *See also, Church of Lukumi Bablu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

180.  Once an employee has articulated his or her sincerely held religious objections to acceptance or receipt of the currently available COVID-19 vaccines, the proper inquiry is thus at its end as to that element.

181.  Defendant's COVID-19 vaccine mandate, which threatens termination for non-compliant employees, discriminates against employees who do not wish to receive the vaccine on religious grounds.

182.  Plaintiff has sought an exemption from Tyson's COVID-19 vaccine mandate on religious grounds.

183.  Those who do not comply with Tyson's COVID-19 vaccine mandate, including employees such as Plaintiff who does so based on his sincerely held religious beliefs, are forced to go on one year of unpaid leave and Plaintiff could lose his current position with Defendant. Furthermore, noncomplying employees who do not receive a COVID-19 vaccine at the end of the leave of absence period, are promised nothing short of termination. This is no reasonable accommodation at all,

42

but rather a punitive measure taken against employees who choose to exercise their religious beliefs.

184. Tyson was made aware of the conflict between its COVID-19 vaccine mandate on the one hand, and Plaintiff's religious beliefs on the other. Tyson responded by implementing an accommodation tantamount to disciplinary action by discharge against Plaintiff.

185. As a result of Tyson's draconian vaccine mandate, most employees will be forced to seek alternative employment during the year and those that refuse the vaccination on religious grounds are unlikely to comply with the mandate within the year, and thus will ultimately be terminated. Furthermore, Plaintiff's position is not guaranteed upon his return.

186. Tyson's failure to provide reasonable religious accommodations has injured and will continue to injure Plaintiff, by discriminatorily denying him income and by terminating his livelihood.

187. Because Plaintiff will establish prima facie showing, the burden shifts to Tyson to show that it could not accommodate the Plaintiff's religious needs without undue hardship. *Tepper, supra*, 505 F.3d at 514.

188. Tyson cannot make a showing of undue hardship, because it cannot show that affording Plaintiffs other accommodations (scheduled testing, masking, etc.) in the context of employer vaccination policies would impose an undue hardship.

189. Tyson thus failed to consider any reasonable accommodations to Plaintiff.[80] Instead, the only accommodation provided by Tyson for a religious exemption is

---

[80] See EEOC Guidance for employers whose employees are unable to be vaccinated due to their sincerely held religious beliefs. *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*

43

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

one year of unpaid leave which is tantamount to termination, and a far cry from the "individualized" assessment required by the EEOC.[81]

190.    As such, Tyson discriminated against the Plaintiffs based on their sincerely held religious beliefs, failed to provide a reasonable accommodation for Plaintiff who requested an accommodation exemption based on religious grounds, and therefore, violated the Missouri Human Rights Commission Act.

**WHEREFORE**, Plaintiff respectfully prays for the following relief in Count V:

a.  For declaratory relief that Defendant Tyson violated the Missouri law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

b.  For declaratory relief that Defendant Tyson violated the law and any other relevant statute when it failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

c.  For injunctive relief enjoining Defendant Tyson, its officers, agents, servants, employees, attorneys, successors, and all persons in active concert or participation with it, from discriminating against Plaintiff by refusing to grant reasonable religious or health accommodations to its COVID-19 vaccination mandate;

d.  For damage caused to Plaintiff by Defendant's actions described herein;

e.  For punitive damage in excess of $100,000.00;

f.  Award Plaintiff's attorneys' fees and costs of suit; and

---

(the "COVID-19 Technical Assistance", https://www.eeoc.gov/newsroom/eeoc-issues-updated-covid-19-technicalassistance, last visited on September 26, 2021.
[81] *See supra*, at Section J, ¶¶ 103-110.

g.  Grant any such further relief as the Court deems necessary and proper in the public interest.

DATED:

APPLEBY AND HEALY, PC.
/s/ John L. Young

_____
John L. Young, MOBAR #36718
119 North Second St.
P.O. Box 158
Ozark, MO 65721
Phone: (417) 581-2411
Fax:: (417) 581-2447
Email:  jyoung@ApplebyHealy.com
**ATTORNEYS FOR PLAINTIFF**

45

STATE OF MISSOURI )
)SS.
COUNTY OF Christian )

On the 25th day of October, 2021, Plaintiff, Clifton Reese, appeared before me and states under oath that the facts and allegations as stated in the above Petition are true and correct to the best of his knowledge, information, and belief.

_____
Clifton Reese

Subscribed and sworn before me on this 25 day of October, 2021.

_____
Notary Public

```
JOHN L. YOUNG
Notary Public, Notary Seal
State of Missouri
Christian County
Commission # 13439213
My Commission Expires 06-06-2022
```

46

Electronically Filed - Barry - October 26, 2021 - 10:07 AM



# Tyson

**COVID-19 Mandatory Vaccination Policy for U.S. Employees[1]**

Having a vaccinated employee population is critical to protecting the health and safety of all Tyson team members and to the continued success of Tyson's business. The new variants of COVID-19 are more contagious and pose a direct threat to individual team members, our workforce as a whole, and our communities. For these reasons, as a condition of continuing employment and in the absence of documented and approved reasonable accommodations for disability or sincerely held religious beliefs, practices, or observances, all U.S.-based Tyson team members are required to be fully vaccinated against the COVID-19 virus and to have provided proof of vaccination to Tyson on or before the following deadlines:

| Team Members | Deadline for Full Vaccination |
|---|---|
| Tyson leadership (officers Grade 93 & above) | September 24, 2021 |
| Corporate team members | October 1, 2021 |
| All other team members[2] *Lowest Grade 58* | November 1, 2021 |
| New hires | By the corresponding 10/1 or 11/1 deadline for those hired prior to those dates. For all new hires with a start date after 10/1 or 11/1, then by their start date. |

For purposes of this Policy, a team member is "fully vaccinated" as of the date that is two weeks following the single dose of the Johnson & Johnson vaccine, or the final dose of a two-shot regimen (Pfizer or Moderna). Vaccination verification information should be submitted directly via the vaccination site, to your Occupational Health Services ("OHS") nurse, or to Human Resources (for those locations that do not have OHS on-site). FAQs associated with the vaccine mandate are also available.

---

[1] This documents the COVID-19 vaccination policy implemented by Donnie King on August 3, 2021.
[2] Collective bargaining agreement language may apply.

*Exhibit A*

## GUIDELINES FOR TYSON UNVACCINATED DRIVERS WHO QUALIFY FOR COVID-19 VACCINATION ACCOMMODATION  Tyson

Per the company's announcement on August 3, 2021, all Tyson U.S. Team Members will be required to be fully vaccinated by November 1, 2021. This requirement also applies to Tyson Drivers and non-Tyson team members such as contractors accessing our facilities to conduct business.

The following accommodation options are available for unvaccinated Tyson Drivers who request and are granted a reasonable accommodation.

### Reasonable Accommodation Options for unvaccinated Tyson Drivers
- Work from home (if applicable).
- Be placed on an unpaid leave of absence.
- Follow Guidelines for Unvaccinated Contract & Dedicated Carriers which requires:
  - Compliance with pre-entry COVID-19 screening process which includes wearing a face mask, temperature checks, symptoms reporting, sanitizing hands, and social distancing of 6 feet or more.
  - Limited /restricted access to physical building owned/operated by Tyson.
  - Limited contact with other Tyson team members (10 minutes or less per site / stop).
  - Must wear Tyson supplied face mask while on Tyson property and outside of designated vehicle.

### Load Pick-up/ Drop-off Process:

- Tyson Drivers with an approved accommodation must remain in their trucks as much as possible when on site.
- Once parked on Tyson property, the Tyson Driver will contact the Distribution Admin (DA) to let them know they are ready for the paperwork exchange.
- Once the DA is ready to exchange the paperwork, they will contact the Tyson Driver to let them know they can proceed to the shipping office or designated location. This will allow the facility to manage the flow of pedestrian traffic to and from the designated location. Remember, the Tyson Driver must not be in the building more than 10 minutes.
- Once the paperwork exchange is complete, the Tyson Driver must immediately return to and remain in their truck until their load is picked up or dropped off and then leave the premises.
- Tyson Drivers who have been granted an accommodation must carry proof of an approved accommodation on their person while on Tyson property.

The Company will continue to monitor the situation and re-assess these guidelines as new information becomes available.

If you have questions, please contact your designated HR Manager @ _____.

9/28/2021

Electronically Filed - Barry - October 26, 2021 - 10:07 AM



**Tyson**

| | **RELIGIOUS ACCOMMODATION POLICY** |
|---|---|

**DOCUMENT CONTACT NAME: TRACEY POYER**
**DOCUMENT CONTACT TITLE: ASSOC DIR EEO**
**BUSINESS AREA: EQUAL EMPLOYMENT OPPORTUNITY, HUMAN RESOURCES**
**PUBLICATION DATE: 01/18/2016**

**1.0    Policy Overview**

1.1.    Tyson Foods, Inc. (Tyson) is committed to providing its Team Members with a workplace that is free from religious discrimination and intolerance. Tyson's policies and federal, state, and local laws prohibit discrimination against individuals because of their *Religion* in hiring, firing, and other terms and conditions of employment.

**2.0    Scope**

2.1.    This policy applies to all current and prospective Team Members of Tyson Foods, Inc.

**3.0    Statements of Policy**

3.1.    This policy is designed to establish guidelines to be used in the event a Team Member or prospective Team Member believes that work requirements conflict with his or her sincerely held religious belief(s) and/or practice(s).

3.2.    In the event of such a conflict, the Team Member, on an individual basis, may request a *religious accommodation*. Each request will be promptly addressed on a case-by-case basis by an authorized HR professional.

3.3.    A request for a *religious accommodation* may be made by an affected team member or prospective Team Member. Information regarding any request shall remain confidential to the extent practicable.

3.4.    Any request for a *religious accommodation* should be communicated to an authorized HR Professional. Other Management personnel who become aware of a need or request for *religious accommodation* must **immediately** direct the Team Member to Human Resources in order to begin the *reasonable accommodation* procedure.

3.5.    The Company will strive to accommodate requests for *religious accommodation*. In many cases, this may involve a different accommodation than the one proposed by the requester as the Company must consider accommodations that cause the least amount of disruption to the workplace and other Team Members while remaining in compliance with the law.

3.6.   Requests for *religious accommodation* should be made 10 days in advance of the needed accommodation unless it is impossible or impracticable to do so.   If a Team Member cannot give 10 days' notice he or she should give as much notice as practicable to allow sufficient time for the Authorized HR Professional to assess the request.

3.7.   Requests for *religious accommodation* are granted or denied on a case-by-case basis and, on occasion, changes in operational needs may prompt the location to re-evaluate previously-approved religious accommodations.

3.8.   If the Authorized HR Professional determines the location cannot grant the accommodation and after consultation with the Director of HR Operations, the Employment Compliance Department will be notified and will initiate a collaborative review process with the location HR, Director of HR Operations, Legal Department, and a chaplain (if desired/applicable).

3.9.   At no time will a final decision to deny a requested *religious accommodation* be made without exhausting the interactive and collaborative process with the respective location HR, Director of HR Operations, the Employment Compliance Department, the Legal Department, and chaplain (if desired/applicable) as circumstances dictate.

3.10.   Upon reaching a determination, the Authorized HR Professional will communicate the Company's position to the requestor.

**4.0    Responsibilities**

4.1.   Only *Authorized HR Professionals* may review and grant reasonable requests for Religious Accommodation.  The *Authorized HR Professional* may collaborate with the Director of HR Operations, Employment Compliance Department, Legal Department, and chaplain (if desired/applicable) as circumstances dictate.

**5.0    Exceptions & Exclusions**

5.1.   None.

**6.0    Additional Policy Information**

**6.1.    Definitions**

6.1.1.   **Religion:**  Includes an individual's sincerely-held moral and ethical beliefs as to what is right and wrong, and moral or ethical duties arising from those beliefs, which are superior to those arising from any human relation, including all aspects of religious observance and practice, as well as belief, but not including what are essentially political, sociological, or philosophical views.

6.1.2.   **Religious Accommodation:**  Any adjustment to the work environment or policies that will allow the Team Member or prospective Team Member to comply with the dictates of his or her religious beliefs.

Tyson Confidential

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

    6.1.3.  **Undue Hardship:** An accommodation is generally considered an undue hardship if it causes more than a minimal or negligible cost or burden on the operation of the business.

        **Authorized HR Professional:** Includes salaried HR professionals who successfully complete Tyson's Harassment & Discrimination Training Certification. Generally, the highest level of HR Manager at the location is the most appropriate Team Member to coordinate religious accommodation requests.

    6.1.4.  **Related Documents:**

        6.1.4.1.   Equal Employment Opportunity Policy

        6.1.4.2.   Harassment and Discrimination Policy

**7.0   Revision Record**

   7.1.   11/09/2011 – Version Imported from SharePoint to PolicyTech

   7.2.   1/19/2016 – Updated policy to eliminate HR practice guidelines and removed all documents under "related documents" associated with internal practice

Tyson Confidential

Electronically Filed - Barry - October 26, 2021 - 10:07 AM



# Tyson

September 17, 2021

     This letter confirms that your request for a disability or religious accommodation from Tyson's mandatory vaccination requirement has been granted and will begin on October 1, 2021 for corporate team members and on November 1, 2021 for plant team members. Because the pandemic raises complex medical and scientific issues, the status of the accommodation is subject to change.

     If your accommodation is an unpaid leave of absence, your local HR Manager will indicate whether the leave is job-protected or not. If you are placed on a leave of absence and your job is not protected, it may be necessary to fill your position.

     In the coming months, risks may be mitigated in other ways which may allow you to return to work. If a return-to-work option becomes available, you will be notified.

     The reasonableness of your accommodation will be assessed on an ongoing basis and is subject to change at any time. If the company determines that providing you with an accommodation is an undue hardship, does not eliminate the direct threat of disease spread, or is unreasonable, your accommodation may be revoked or modified. If your accommodation is revoked or modified, you will be expected to immediately comply with Tyson's Mandatory Vaccination Policy or further instructions to avoid termination.

     Should you have any questions, please reach out to your local HR partner.

*Lola Hithon*

Lola Hithon
VP, Employee Relations and Compliance

Exhibit C

Tyson Foods, Inc.
2200 W. Don Tyson Pkwy., Springdale, AR 72762
Phone: 1-800-643-3410   Website: www.tysonfoods.com

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

**Reese, Clifton**

| | |
|---|---|
| **From:** | Reese, Clifton |
| **Sent:** | Tuesday, August 31, 2021 1:03 PM |
| **To:** | Fritts, April |
| **Subject:** | RE: Vaccine Status |

Awesome! Thank you.

**From:** Fritts, April <April.Fritts@tyson.com>
**Sent:** Tuesday, August 31, 2021 1:02 PM
**To:** Reese, Clifton <Clifton.Reese@tyson.com>
**Subject:** RE: Vaccine Status

All level of management at the plant and live... yes

**From:** Reese, Clifton <Clifton.Reese@tyson.com>
**Sent:** Tuesday, August 31, 2021 12:57 PM
**To:** Fritts, April <April.Fritts@tyson.com>
**Subject:** RE: Vaccine Status

That includes my level of management?

**From:** Fritts, April <April.Fritts@tyson.com>
**Sent:** Tuesday, August 31, 2021 12:57 PM
**To:** Reese, Clifton <Clifton.Reese@tyson.com>
**Subject:** RE: Vaccine Status

Moderna – 9/20
Pfizer – 9/27
J&J – 10/18

**From:** Reese, Clifton <Clifton.Reese@tyson.com>
**Sent:** Tuesday, August 31, 2021 12:53 PM
**To:** Fritts, April <April.Fritts@tyson.com>
**Subject:** RE: Vaccine Status

So what is the deadline?

**From:** Fritts, April <April.Fritts@tyson.com>
**Sent:** Tuesday, August 31, 2021 12:10 PM
**To:** Reese, Clifton <Clifton.Reese@tyson.com>
**Subject:** RE: Vaccine Status

Got it...

Exhibit D

1

**From:** Reese, Clifton <Clifton.Reese@tyson.com>
**Sent:** Tuesday, August 31, 2021 12:09 PM
**To:** Fritts, April <April.Fritts@tyson.com>
**Subject:** Re: Vaccine Status

I'm not confused. I just want to make sure I have the correct dates for the deadline.

Get Outlook for Android

---

**From:** Fritts, April <April.Fritts@tyson.com>
**Sent:** Tuesday, August 31, 2021 11:41:07 AM
**To:** Reese, Clifton <Clifton.Reese@tyson.com>
**Subject:** RE: Vaccine Status

This is just a declaration of your intent. Not a deadline to be vaccinated... do not get the two confused.

**From:** Reese, Clifton <Clifton.Reese@tyson.com>
**Sent:** Tuesday, August 31, 2021 11:30 AM
**To:** Fritts, April <April.Fritts@tyson.com>
**Subject:** RE: Vaccine Status

Again, what is the deadline for each level of management including my level of management? I'm just trying to full understand so I can communicate with in my team.

**From:** Fritts, April <April.Fritts@tyson.com>
**Sent:** Tuesday, August 31, 2021 11:06 AM
**To:** Reese, Clifton <Clifton.Reese@tyson.com>
**Subject:** Vaccine Status

I am sorry your current compliance status with the vaccine requirement was shared with others. I assure it was inadvertent and will not happen again. However, we still need you to declare your intent regarding the vaccination requirement. Please access the vaccination site] and declare your intent. Again, if you need an accommodation you can let me know or make that request through the vaccination site.



April K. Fritts, Human Resources Manager
Monett, Poultry Operations

Tyson Foods | The Protein Company™
(desk) 417-235-9340
april.fritts@tyson.com

Tyson is an Equal Opportunity/Affirmative Action Employer. All qualified applicants will be considered without regard to race, gender, national origin, color, religion, age, genetics, sex, sexual orientation, disability or veteran status.

2

Electronically Filed - Barry - October 26, 2021 - 10:07 AM

IN THE CIRCUIT COURT OF BARRY COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| CLIFTON REESE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) Case No.: | |
| | ) | |
| TYSON FOODS, INC., | ) | |
| a corporation, | ) | |
| | ) | |
| Defendant. | ) | |

<u>MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUCTION</u>

COMES NOW, Clifton Reese, through attorney of record John L. Young of Appleby Healy, Attorney at Law, P.C., and moves the court, pursuant to Rule 92.02 of the Missouri Rules of Civil Procedure, for a temporary restraining order and preliminary injunction in the above-entitled cause of action and joining Defendant Tyson Foods Inc, its agents, servants, employees, and attorneys, or anyone acting on Defendant's behalf and further states:

1. Defendant seeks to change Plaintiff's deeply held religious belief against the COVID-19 vaccination and Defendant's mandatory COVID-19 vaccination for continued employment by placing him on permanent leave without pay beginning November 1, 2021.

2. Unless restrained, Defendant Tyson Foods will immediately force Plaintiff on leave without pay, having loss in his current employment benefits, loss of salary, pay, and not receive his earned annual bonus due to his exercise of his religious objection to the mandatory COVID-19 vaccination policy imposed by the Defendant.

3. Immediate and irreparable injury, loss, and damage result to the Plaintiff by reasons of the threatened action of the Defendant, as more particularly appears in the verified petition filed herein and the attached affidavit of the Plaintiff Clifton Reese.

4. The Plaintiff has no adequate remedy under the law.

5. If this temporary restraining order and preliminary injunction be granted, the injury, if any to Defendant herein, if found judgment be in the favor of the Defendant, will be inconsiderable compared to damage caused by Plaintiff by loss of his employment. Plaintiff is requesting maintaining the status quo until further hearing on the merits of his claim.

6. Plaintiff further moves the court that the trial of this cause on the merits be advanced and consolidate with hearing of this Motion for Preliminary Injunction.

7. Because Plaintiff is requesting the status quo be maintained, no bond should be required.

WHEREFORE, Plaintiff hereby requests the court to issue temporary restraining order and preliminary injunction against the Defendant concerning any change in the Plaintiff's employment due to his religious exemption to the COVID-19 vaccination.; for Plaintiff's attorneys' fees; for cost; and any other relief the court deems just and proper under the circumstances.

APPLEBY AND HEALY, PC.
/s/ John L. Young

John L. Young, MOBAR #36718
119 North Second St.
P.O. Box 158
Ozark, MO 65721
Phone: (417) 581-2411
Fax:: (417) 581-2447
Email: jyoung@ApplebyHealy.com
ATTORNEYS FOR PLAINTIFF

Electronically Filed - Barry - October 26, 2021 - 10 07 AM

## IN THE CIRCUIT COURT OF BARRY COUNTY
## STATE OF MISSOURI

CLIFTON REESE, )
)
     Plaintiff, )
)
vs. ) Case No.:
)
TYSON FOODS, INC., )
a corporation, )
)
     Defendant. )

## AFFIDAVIT OF PLAINTIFF

COMES NOW Plaintiff Clifton Reese who states under oath to the best of his knowledge and belief the following:

1. Plaintiff Clifton Reese has personal knowledge of events described in this affidavit and he is over the age of 18.

2. Defendant seeks to change Plaintiff's deeply held religious belief against the COVID-19 vaccination and Defendant's mandatory COVID-19 vaccination for continued employment by placing him on permanent leave without pay beginning November 1, 2021.

3. Unless restrained, Defendant Tyson Foods will immediately force Plaintiff on leave without pay, having loss in his current employment benefits, loss of salary, pay, and not receive his earned annual bonus due to his exercise of his religious objection to the mandatory COVID-19 vaccination policy imposed by the Defendant.

4. Immediate and irreparable injury, loss, and damage result to the Plaintiff by reasons of the threatened action of the Defendant, as more particularly appears in the verified petition filed herein and the attached affidavit of the Plaintiff Clifton Reese.

5. The Plaintiff has no adequate remedy under the law.

6. If this temporary restraining order and preliminary injunction be granted, the injury, if any to Defendant herein, if found judgment be in the favor of the Defendant, will be inconsiderable compared to damage caused by Plaintiff by loss of his employment. Plaintiff is requesting maintaining the status quo until further hearing on the merits of his claim.

7. Plaintiff further moves the court that the trial of this cause on the merits be advanced and consolidate with hearing of this Motion for Preliminary Injunction.

8. Because Plaintiff is requesting the status quo be maintained, no bond should be required.

9. Affiant further sayeth not.

_____
Clifton Reese

STATE OF MISSOURI     )
                             )SS.
COUNTY OF Christian )

On the 25st day of October, 2021, Plaintiff, Clifton Reese, appeared before me and states under oath that the facts and allegations as stated in the above Affidavit are true and correct to the best of his knowledge, information, and belief.

Subscribed and sworn before me on this 25st day of October, 2021.

_____
Notary Public

JOHN L. YOUNG
Notary Public, Notary Seal
State of Missouri
Christian County
Commission # 13439213
My Commission Expires 06-06-2022